COURT OF APPEALS, DECEMBER TERM, 1821.

The State *vs.* Buchanan, *et al.*

ERROR to *Harford* county court. In this case an indictment was found in *Baltimore* city court against the defendants in error; and on their suggestion, supported by affidavits, that a fair and impartial trial could not be had, &c.

Dec. 1821.

The State
vs
Buchanan

A writ of error lies at the instance of the state in a criminal prosecution.
A transcript of the record, certified under the hand of the clerk and seal of the court,

with the writ of error annexed, is a legal and sufficient return to such writ of error.
The offence of conspiracy is of common law origin; and not restricted or abridged by the statute 33 *Edward* I.
A conspiracy to do any act that is criminal *per se*, is an indictable offence at common law.
An indictment will lie at common law, 1. For a conspiracy to do an act not illegal, nor punishable if done by an individual, but immoral only. 2. For a conspiracy to do an act neither illegal nor immoral in an individual, but to effect a purpose which has a tendency to prejudice the public 3. For a conspiracy to extort money from another, or to injure his reputation by means not indictable if practised by an individual, as by verbal defamation, and that whether it be to charge him with an indictable offence or not. 4. For a conspiracy to cheat and defraud a third person, *accomplished* by means of an *act* which would not in law *amount* to an indictable cheat, if effected by an individual. 5. For a malicious conspiracy to impoverish or ruin a third person in his trade or profession. 6. For a conspiracy to defraud a third person by means of an act not *per se* unlawful, and though no person he thereby injured 7 For a bare conspiracy to cheat or defraud a third person, though the means of effecting it should not be determined on at the time. 8. A conspiracy is a substantive offence, and punishable at common law, though nothing be done in execution of it.
In a prosecution for a conspiracy, it is sufficient to state in the indictment, the conspiracy and the object of it: and the means by which it was intended to be accomplished need not be set out.
Every conspiracy to do an unlawful act, or to do a lawful act for an illegal, fraudulent, malicious, or corrupt purpose, or for a purpose which has a tendency to prejudice the public in general, is at common law an indictable offence, though nothing be done in execution of it, and no matter by what means the conspiracy was intended to be effected; which may be perfectly indifferent, and makes no ingredient of the crime, and therefore need not be stated in the indictment.
Our ancestors brought with them the laws of the mother country, so far at least as they were applicable to their situation, and the condition of an infant colony. They were in the predicament of a people discovering and planting an uninhabited country. And if they brought with them the common law of conspiracy, they brought it as it is now settled and known in *England*. It is to judicial decisions that we are to look for the evidences of the common law.
The *third* section of the Bill of Rights has reference to the common law in mass, as it existed here, either potentially, or practically, and as it prevailed in *England* at that time, except such portions of it as are inconsistent with the spirit of that instrument, and the nature of our new political institutions; and it cannot be inconsistent with, or repugnant to the spirit and principles of our institutions, to correct the morals and protect the reputation, rights and property of individuals, by punishing corrupt combinations falsely to rob another of his reputation, maliciously to ruin him in his business, or fraudulently to cheat him of his property.
An indictment having two counts, the *first* charging the defendants with an executed conspiracy,

Dec. 1821.

The State
vs
Buchanan

the proceedings were removed to *Harford* county court for trial. The indictment is as follows, viz. "State of *Maryland*, city of *Baltimore*, to wit: The jurors for the state of *Maryland* for the body of the city of *Baltimore*, on their oath present, that by an act of congress of the *United States*, passed on the tenth day of April, in the year of our Lord one thousand eight hundred and sixteen, at the city of *Washington*, entitled, "An act to incorporate the subscribers to the Bank of the *United States*" a bank was established and chartered as a corporation and body politic, by the name and style of *The President, Directors and Company, of the Bank of the United States*, with authority, power and capacity, among other things, to have, purchase, receive, possess, enjoy and retain, to them and their successors, lands, rents, tenements, hereditaments, goods, chattels and effects, of whatsoever kind, nature and quality, to an amount not exceeding in the whole, fifty-five millions of dollars, to deal and trade in bills of exchange, gold and silver bullion, and to take at the rate of six *per centum per annum* for or upon its loans or discounts, and to issue bills or notes signed by the president, and countersigned by the principal cashier or treasurer thereof, promising the payment of money to any person or persons, his, her, or their order, or to bearer. And that under and by virtue of the power and authority given to the said directors by the said act of congress, an office of discount and deposit of the said corporation was, at the time hereinafter mentioned, regularly and duly established in pursuance of the power contained in the said act, at the city of *Baltimore*, in the state of *Maryland* aforesaid, and that *George Williams*, late of the city of *Baltimore*, merchant, was at the time hereinafter mentioned, and before and afterwards, one of the directors of the said bank of the *United States* at *Philadelphia*, to wit, at the city of *Baltimore* aforesaid, and that *James A. Buchanan*, late of the city of *Baltimore*, merchant, was at the time hereinafter mentioned, and before and since, president of the said office of

falsely, fraudulently and unlawfully, by wrongful and indirect means, to cheat, defraud and impoverish the President, Directors and Company of the Bank of the *United States*; and the second charging them with a conspiracy only, falsely, fraudulently and unlawfully, by wrongful and indirect means, to cheat, defraud and impoverish the President. Directors and Company of the Bank of the *United States*;—where one of the defendants was the president of the office of discount and deposit of the mother bank, another the cashier of that office, and the other a director of the mother bank—*Held*, that the matter charged in each count in the indictment constitutes a punishable conspiracy at common law, and that that portion of the common law is in force in this state.

Under the constitution of the *United States* the courts of this state have jurisdiction of the offence charged in the above indictment.

On the reversal of a judgment rendered in favour of the traversers in a criminal prosecution, a *procedendo* was awarded directing a new trial.

discount and deposit of the said Bank of the *United States* in the city of *Baltimore*, and *James W. M'Culloh*, late of the city of *Baltimore*, gentleman, was at the time hereinafter mentioned, and before and afterwards, cashier of the said office of discount and deposit of the said Bank of the *United States* in the city of *Baltimore*, to wit, at the city of *Baltimore* aforesaid. And that the said *George Williams*, so being one of the directors of the said Bank of the *United States*, and the said *James A. Buchanan*, so being president of the said office of discount and deposit of the said bank in the city of *Baltimore*, and the said *James W. M'Culloh*, so being cashier of the said office of discount and deposit of the said bank in the city of *Baltimore*, being evil disposed and dishonest persons, and wickedly devising, contriving, and intending, falsely, unlawfully, fraudulently, craftily and unjustly, and by indirect means, to cheat and impoverish the said president, directors and company, of the Bank of the *United States*, and to defraud them of their monies, funds, and promissory notes for the payment of money, commonly called bank notes, and of their honest and fair gains to be derived under and pursuant to the said act of congress from the use of their said monies, funds, and promissory notes for the payment of money, commonly called bank notes, on the eighth day of May, in the year of our Lord one thousand eight hundred and nineteen, at the city of *Baltimore* aforesaid, with force and arms, &c. did wickedly, falsely, fraudulently and unlawfully conspire, combine, confederate and agree together, by wrongful and indirect means, to cheat, defraud and impoverish, the said president, directors and company of the Bank of the *United States*, and by subtle, fraudulent, and indirect means, and divers artful, unlawful and dishonest devices and practices, to obtain and embezzle a large amount of money, and promissory notes for the payment of money, commonly called bank notes, to wit, of the amount and value of fifteen hundred thousand dollars current money of the *United States*, the same being then and there the property, and part of the proper funds of the said president, directors and company, of the Bank of the *United States*, from and out of the said office of discount and deposit of the said bank in the city of *Baltimore*, without the knowledge, privity or consent of the said president, directors and company, of the Bank of the *United States*,

and also without the privity, consent or knowledge of the directors of the said office of discount and deposit of the said bank in the city of *Baltimore*, for the purpose of having and enjoying the use thereof for a long space of time, to wit, for the space of two months, without paying any interest, discount or equivalent, for the use thereof, and without securing the repayment thereof to the said corporation. And the more effectually and securely to perpetrate and conceal the same, that the said *James W. M'Culloh* should, from time to time, falsely and fraudulently state, allege and represent, to the said directors of the said office of discount and deposit in the city of *Baltimore*, that such monies and promissory notes, so agreed to be obtained and embezzled as aforesaid, were loaned on good, sufficient and ample security, in capital stock of the said bank, pledged and deposited therefor; and also should from time to time make and fabricate false statements and vouchers respecting the same, and other property and funds of the said corporation, to be laid before and exhibited to the said directors of the said office of discount and deposit of the said bank in the city of *Baltimore*. And that the said *George Williams, James A. Buchanan*, and *James W. M'Culloh*, being such officers of the said corporation as aforesaid, did then and there, in pursuance of and according to the said unlawful, false, and wicked conspiracy and confederacy, combination and agreement aforesaid, by indirect, subtle, wrongful, fraudulent and unlawful means, and by divers artful and dishonest devices and practices, and without the knowledge, privity or consent of the said president, directors and company, of the Bank of the *United States*, and without the privity, knowledge or consent of the directors of the said office of discount and deposit of the said bank in the city of *Baltimore*, obtain and embezzle a large amount of monies, and of promissory notes for the payment of money, commonly called bank notes, the same being the property and part of the proper funds of the said corporation, from and out of their said office of discount and deposit in the city of *Baltimore*, to wit, of the amount and value of fifteen hundred thousand dollars current money of the *United States*, for the purpose of having and enjoying the use thereof, and did have and enjoy the use thereof, for a long space of time, to wit, for the space of two months, without paying any interest,

discount or equivalent therefor, and without securing the repayment of the said monies, and the said promissory notes for the payment of money commonly called bank notes; and did then and there falsely, craftily, deceitfully, fraudulently, wrongfully and unlawfully, keep and convert the same to their own use and benefit, without the knowledge, privity or consent of the said corporation, and without the knowledge, privity or consent of the directors of the said office of discount and deposit in the city of *Baltimore*; and did then and there, the more effectually to perpetrate and conceal the said conspiracy, confederacy, fraud and embezzlement, cause and procure false and fraudulent representations, allegations, statements and vouchers, to be made and fabricated, and the same to be exhibited to and laid before the directors of the said office of discount and deposit in the city of *Baltimore*, by the said *James W. M'Culloh*, as cashier of the said office of discount and deposit, respecting the said monies, and the said promissory notes for the payment of money, so obtained and embezzled as aforesaid, in which said representations, allegations, statements and vouchers, it was then and there falsely and fraudulently represented, alleged and exhibited, that the said monies, and promissory notes for the payment of money, were loaned on good, sufficient, and ample security, in capital stock of the said bank, pledged and deposited therefor, when in truth and in fact no capital stock of the said bank, and no other security, was pledged or deposited therefor, as the said *George Williams, James A. Buchanan*, and *James W. M'Culloh*, then and there well knew. And that the said false, wicked, unlawful, and fraudulent conspiracy, confederacy and agreement, above mentioned, and the said false, wicked, unlawful, and fraudulent acts, done in pursuance thereof above set forth, were then and there made, done and perpetrated, by the said *George Williams, James A. Buchanan*, and *James W. M'Culloh*, in abuse and violation of their duty, and the trust reposed in them, and the oaths taken and lawfully sworn by them respectively as such officers of the said corporation as aforesaid. And that the said *George Williams, James A. Buchanan*, and *James W. M'Culloh*, did then and there thereby falsely, wickedly, fraudulently, wrongfully and unlawfully, impoverish, cheat and defraud, the said president, directors and company, of the Bank of the *United States*, to the

great damage of the said president, directors and company, to the evil example of all others in like manner offending, and against the peace, government and dignity of the state of *Maryland,* &c.

And the jurors aforesaid, on their oath aforesaid, do further present, that the said *George Williams,* so being one of the directors of the said Bank of the *United States* at *Philadelphia,* to wit, at *Baltimore* aforesaid, and the said *James A. Buchanan,* so being president of the said office of discount and deposit of the said bank in the city of *Baltimore,* and the said *James W. M'Culloh,* so being cashier of the said office of discount and deposit of the said bank in the city of *Baltimore,* being evil disposed and dishonest persons, and wickedly devising, and contriving, and intending, falsely, unlawfully, fraudulently, craftily and unjustly, and by indirect means, to cheat and impoverish the said president, directors and company of the Bank of the *United States,* and to defraud them of their monies, funds, and promissory notes for the payment of money, commonly called bank notes, and of their honest and fair gains to be derived under and pursuant to the said act of congress, from the use of their said monies, funds, and promissory notes for the payment of money, commonly called bank notes, afterwards, to wit, on the eighth day of May, in the year of our Lord one thousand eight hundred and nineteen, at the city of *Baltimore* aforesaid, with force and arms, &c. did wickedly, falsely, fraudulently, and unlawfully conspire, combine, confederate and agree together, by wrongful and indirect means, to cheat, defraud and impoverish, the said president, directors and company of the Bank of the *United States,* and by subtle, fraudulent, and indirect means, and divers artful, unlawful, and dishonest devices and practices, to obtain and embezzle a large amount of money; and of promissory notes for the payment of money, commonly called bank notes, to wit, of the amount and value of fifteen hundred thousand dollars current money of the *United States,* the same being then and there the property and part of the proper funds of the said president, directors and company, of the Bank of the *United States,* of and out of the said office of discount and deposit of the said bank in the city of *Baltimore,* without the knowledge, privity or consent, of the said president, directors and company of the Bank of the *United States,* and

also without the privity, consent or knowledge, of the directors of the said office of discount and deposit of the said bank in the city of *Baltimore*, for the purpose of having and enjoying the use thereof for a long space of time, to wit, for the space of two months, without paying any interest, discount or equivalent for the use thereof, and without securing the repayment thereof to the said corporation. And that the said false, wicked, unlawful, and fraudulent conspiracy, confederacy and agreement, above mentioned, were then and there made, done and perpetrated, by the said *George Williams, James A. Buchanan*, and *James W. M'Culloh,* in abuse and violation of their duty, and the trust reposed in them, and the oaths taken and lawfully sworn by them respectively as such officers of the said corporation as aforesaid, to the great damage of the said president, directors and company, to the evil example of all others in like manner offending, and against the peace, government and dignity, of the state of *Maryland*, &c.

*Luther Martin*, Attorney General of *Maryland*, and District Attorney of *Baltimore* City Court.

Dec. 1821.

The State
vs
Buchanan

To which indictment there was the following *special demurrer,* viz. "And the said *James A. Buchanan, James W. M'Culloh,* and *George Williams,* protesting, not confessing the truth of the matters and things in said indictment contained, come and defend the force, &c. when, &c. and say that the said indictment, in manner and form aforesaid above made, and the matter therein contained, are not sufficient in law for the said state to have and maintain its said prosecution against them, to which said indictment they have no need, nor are obliged by the law of the land to answer; and this they are ready to verify: Wherefore, for want of a sufficient indictment in this behalf, the said *James A. Buchanan, James W. M'Culloh,* and *George Williams,* pray judgment, if the said state ought to have or maintain its said prosecution against them. And for causes of demurrer in law in this behalf, the said *James A. Buchanan, James W. M'Culloh,* and *George Williams,* according to the form of the statute in such cases lately made and provided, shew to the court here these causes following; that is to say, for this, that the matters and things charged in said indictment, in manner and form as therein charged, do not import or contain any charge of crime in

law; and also that said indictment is vague, contradictory, inconsistent, and wholly insufficient in law; and also that the matters and things in said indictment contained, in manner and form as therein charged, are not cognizable by nor within the jurisdiction of this court, but are exclusively cognizable under the authority of the *United States.*" The District Attorney, on the part of the state, joined in demurrer.

The County Court, [*Hanson* and *Ward*, A, J. (a,)] ruled the demurrer good, and discharged the defendants. The present writ of error was brought on the part of the state.

The case was argued in this court before CHASE, Ch. J. BUCHANAN, EARLE, and MARTIN, J.

*Murray*, (District Attorney of the sixth judicial district by substitution of *Williams*, the assistant Attorney General, with the approbation of the court,) assisted by *Wirt*, (Attorney General of *U. S.*) *Harper* and *Mitchell*, on the part of the state, stated, that the questions which would be presented to the consideration of the court were—

1. Whether a writ of error would lie at the instance of the state, in a criminal prosecution?

2. And if the writ of error has been properly sued out, whether the record returned in pursuance of the writ of error has been legally certified?

3. Whether the facts charged in the indictment amount to a criminal offence?

4. And if so, whether this case is cognizable in the courts of this state?

On the *first point*, they contended, that a writ of error would lie at the instance of the state in a criminal prosecution, and they referred to *The King vs. Marquis of Winchester*, Sir *Wm. Jones*, 407. Cro. Car. 504, S. C. 2 *Bac. Ab.* tit. *Error*, 453. 5 *Vin. Ab.* tit. *Error*, 479. *Cooke vs. Lainday*, Cro. Jac. 210. *The State vs. Messersmith & Askew. The State vs. Forney. The State vs. Brown*; and *The State vs. Durham*; all in the general court, and *reversed* at May Term, 1793. *The State vs. Spence* at June Term, 1817. 1 *Chitty's C. L.* 664, 747, (514,) 752. *Wilks's Case*, 4 *Burr.* 2250. 4 *Blk. Com.* 393, 398, 399. 2 *Hale's P. C.* 210, 247, 248, 393. 2 *Com. Dig.* tit. *Certiorari*, (A 1) 188. *The King*

(a) *Dorsey* Ch. J. dissented. The opinion of the court, and of the chief judge, are published at length in a book called "*A Report of the Conspiracy Cases.*"

*vs.* Hedgecock in Provincial Court in 1701. *Jac. L. D.* tit.
*Certiorari,* 412. *Fitz. N. B.* 557, (H.) 1 *Vern.* 170, 175.

On the *second point,* they contended, that under the law, and the usage and practice of our courts, the record had been formally and legally certified. They referred to *Burke vs. The State,* in this court at June term, 1809. 2 *Harr. Ent.* 58, 225, 240, 221, 227, 263. 1 *Chitty's C. L.* 662, 749. 2 *Tidd's Pr.* 1088, 1089, 1090. *Jacob's L. D.* tit. *Certificate. Ibid,* tit. *Clerk.* The act of 1713, *ch.* 4, *s.* 4, 5. *The State vs. Messersmith,* and others, before referred to. *Cumming vs. The State,* 1 *Harr. & Johns.* 340. *Martin vs. The State, Ibid* 721. *Wood vs. Lide,* 4 *Cranch,* 180.

On the *third point*—Whether the matters charged in the indictment amounted to an offence which could be prose-cuted as a crime? they contended, that conspiracy was an offence at common law; that the statute *de conspiratoribus,* passed in the 33d year of the reign of *Edward* I. did not introduce a new rule, but was merely in affirmance of the common law; that the *gravamen* of the offence consisted in the unlawful combination or confederacy to injure a third person, and not in the actual execution of that unlawful or wrongful purpose. In support of their argument they cited 1 *Hawk. P. C. ch.* 72, *s.* 2, *p.* 189. 3 *Chitty's C. L.* 1139. *Staunf. P. C.* 173, 174. 1 *Burn's Just.* 389. 2 *Jacob's L. D.* tit. *Conspiracy,* 30. *Termes de Ley,* tit. *Covin. Plow.* 46, 54. *Co. Litt.* 357. *The King vs. Edwards* and others, 8 *Mod.* 320. 1 *Stra.* 707, S. C. cited in 1 *East's C. L.* 462. 4 *Blk. Com.* 137, *(Christian's Note.)* 3 *Wils. Lect.* 118. 2 *Reeves Hist. C. L.* 239, 240, 275, 357. 3 *Reeves,* 122, *Cowel's Inst.* 215, 282. 1 *Inst.* 143. 2 *Inst.* 283, 383, 384, 561, 562. *Smith Crashaw,* Sir *W. Jones,* 93. 3 *Inst.* 143. *Book of Assizes,* 138, pl. 44, *ar.* 5, 6, 19; 102, pl. 77; 131, pl. 62; 134, pl. 12; 137, pl. 33, 34; 141, pl. 59; 144, pl. 72, 73, 74; 146, pl. 12; 166, pl. 48, 49; 177, pl. 21; 238, pl. 12, 19. *Britton,* tit. *Larcen,* 24. *Fitz. N. B.* 114, 134, 135, 216. 2 *Coke Litt.* 264, 265. *Latch,* 202. 2 *Roll. Ab.* 77, 78. *Rex vs. Breerton & Townsend, Noy's Rep.* 103, cited in 2 *East's C. L.* 823. Lord *Gray's* Case, *Moore* 788. *Scrog's vs. Peck & Gray, Ibid* 562. *The Poulterer's* Case, *Ibid* 814. 9 *Coke,* 56, S. C. 1 *Hawk. P. C.* 348, 349. *Timberly & Childe,* 1 *Siderfin,* 68. 1 *Lev* 62, S. C. *Childe vs. North & Timberly,* 1 *Keble,* 203. *The King vs. Timberly, Ibid* 254, 675. *The King vs. Skirrett* and others, 1 *Siderfin,* 312, cited

in 2 *East's C. L.* 823. *The King vs. Armstrong* and others, 1 *Vent.* 304. *The King vs. Parris* and others, 1 *Sid.* 431. 1 *Vent.* 49, S. C. cited in 2 *East's C. L.* 823. *The Queen vs. Best* and others, 6 *Mod.* 185. 1 *Salk.* 174, S. C. 2 *Ld. Raym.* 1167, S. C. *Holt,* 151, S. C. *The King vs. Commings* and others, 5 *Mod.* 180. *The Queen vs. Orbell,* 6 *Mod.* 42, cited in 2 *East's C. L.* 823. *The Queen vs. Macarty* and others, 6 *Mod.* 302. 2 *Ld. Raym.* 1179, S. C. 3 *Ld. Raym.* 487, S. C. cited in 2 *East's C. L.* 823. *The Queen vs. Daniel,* 6 *Mod.* 99. 2 *Ld. Raym.* 1116, S. C. *The Queen vs. Glanvil, Holt Rep.* 354. *The Queen vs. Parry* and others, 2 *Ld. Raym.* 865. *The King vs. Venables,* 8 *Mod.* 378. *The King vs. O'Brian,* 13 *Vin. Ab.* 460, cited in 2 *East's C. L.* 825. *The King vs. Grimes & Thompson,* 3 *Mod.* 220. *The King vs. The Journeyman Tailors,* 8 & 9 *Mod.* 11. *The King vs. Starling,* (The *Tubwomen's* case,) 1 *Sid.* 174. 1 *Lev.* 125, S. C. 1 *Keble,* 650, 655, 672, 682, S. C. *Seele's* and others case, *Cro. Car.* 557. *The Queen vs. Blacket & Robinson,* 7 *Mod.* 39. *The King vs. Rispal,* 3 *Burr.* 1320. 1 *W. Blk. Rep.* 368, S. C. *The King vs. Parsons,* 1 *W. Blk. Rep.* 392. *The King vs. Benfield & Saunders,* 2 *Burr.* 980. *The King vs. March, Ibid* 999. *The King vs. Spragge* and others, *Ibid* 993. *The King vs. Wheatly, Ibid* 1127. 1 *W. Blk. Rep.* 275, S. C. *The Queen vs. Bryan,* 2 *Stra.* 866, cited in 2 *East's C. L.* 825. *The King vs. Govers, Sayer's Rep.* 206. *The King vs. Cope* and others, 1 *Stra.* 144. *The King vs. Kinnersley & Moore, Ibid* 193. *The King vs. Ward,* 2 *Stra.* 747, cited in 2 *East's C. L.* 825. *The King vs. Lord Grey* and others, 3 *State Trials,* 519, cited in 1 *East's C. L.* 460. *The King vs. Delaval,* 3 *Burr.* 1434, 1439. 1 *W. Blk. Rep.* 410, 439, S. C. *The King vs. Bower, Cowp.* 323. *The King vs. Croke, Ibid* 28. *The King vs. Robinson & Taylor,* 1 *Leach, C. L.* 38, 44. 2 *East's C. L.* 1010. *Waites's* case, 1 *Leach,* 33. 2 *East's C. L.* 570. *Bazeley's* case, 2 *Leach,* 973. 2 *East's C.L.* 571. *Eccles* case, 1 *Leach,* 276. *Macklin's* case, 2 *Chitty, C. L.* 495. *Hevey's* case, 2 *East's C. L.* 856, 1010. 1 *Leach,* 268. 2 *Leach,* 790. 2 *East's C. L.* 823, 832, 837, 853, 862, 863, 973, 1004. *Vertue vs. Ld. Clive,* 4 *Burr.* 2472. *The King vs. Wilkes, Ibid* 2549. *The King vs. Mason,* 2 *T. R.* 581. *The King vs. Mawbey* and others, 6 *T. R.* 628, 636. *The King vs Lara, Ibid* 565. *Clifford vs. Brandon,* 2 *Campb.* 358, 372, (note.) *The King vs. Philips,* 6 *East's Rep.* 466.

The King vs. De Berenger, 3 Maule & Selw. 68. The King vs. Gill & Henry, 2 Barnw. & Alder. 204. The King vs. Turner and others, 13 East's Rep. 228. Tomlin's case, God-bolt, 444. Nelson's Just. 171. Rex vs. Turner and others, 1 Tremaine, 83. Rex vs. Crisp and others, Ibid 84. Rex vs. Record and others, Ibid 86. Rex vs. Wilcox, Ibid 91. Rex vs. Taydler and others, Ibid 96. Rex vs. Alebone and others, Ibid 97. Rex vs. Montague, Ibid 20 9. 4 Went. Pleдd. 79 to 113. Crown C. C. tit. Deceit. Ibid. tit. Conspiracy. 3 Chitty's C. L. 1145, to 1193. The Commonwealth vs. Ward and others, 1 Mass. Rep. 473. The same vs. Judd and others, 2 Mass. Rep. 329. The same vs. Tibbert sr. & jr. Ibid 536. The Journeymen Cordwainer's cases in New-York, Philadelphia & Baltimore. They also contended that our ancestors, when they settled the colony, brought the common law with them as part of their birth right, and that the law of conspiracy, being a part of the common law, was in as full force here as in England, and that the decisions of the English courts since, as well as before the revolution, were evidence of what the law of conspiracy is in this state—and that, according to those decisions, there could be no doubt but that all confederacies and agreements to injure third persons in their persons, their property, or their character, were indictable conspiracies in this state. They referred to Calvin's case, 7 Coke 1. 1 Blk. Com. 107. Griffith vs. Griffith, 4 Harr. & M·Hen. 101. Coomes vs. Clements, in this court June term, 1819. 5 Com. Dig. tit. Navigation, (G 1.) 4 Com. Dig. tit. Lais. Blanket vs. Gordon, 2 P. Wms. 74, 75. Jackson vs. Gilchrist, 15 Johns. Rep. 103, 140. Sir John Randolph's opinion in Smith's Hist. N. Y. Charter of Maryland, sect. 10. 5 Jacob's L. D. tit. Plantation. The act of 1649, ch. 4. Decl. of Rights, sect. 3.

On the fourth point, whether this case was cognizable by the courts of this state? they cited The Const. U. S. art. 3, s. 2. Amend. 9, 10. The Federalist, 2 vol. 227, 230, 234. Ibid 3 vol. 264. 5 vol. L. U. S. 262, 268. The United States vs. Worrell, 2 Dall. Rep. 394. The Commonwealth vs. Shaver, 4 Dall. Rep. 28. The United States vs. Hudson & Goodwin, 7 Cranch, 32. The United States vs. Cooledge, 1 Wheat. 415. Martin vs. Hunter's Lessee, Ibid 323. Sturgis vs. Crowningshield, 4 Wheat. 122, 193, 195, 196, 199. M·Culloh vs. Maryland, Ibid 410. Livingston vs. Van Ingen, 9 Johns. Rep. 574. Houston vs. Moore, 5 Wheat. 33, 34, 49. Cohens vs. Virginia, 6 Wheat. 399.

*Pinkney, Winder* and *Raymond,* for the defendants in error, contended, 1. That the state could not have a writ of error in a criminal case; that no authority for such a proceeding had been or could be shown. 2. That if the state could bring a writ of error in a criminal case, the record returned with the writ had not been certified in the manner directed by law for certifying a record in a criminal case. 3. That if the writ of error was rightfully brought, and the record legally certified, still there was no error in the judgment of the court below. (Authorities *supra.*) That the statute 33 *Edw.* I, was the origin of the law of conspiracy, and that statute did not include conspiracies to cheat. That cheating itself, with one or two exceptions, such as cheating with false weights, false measures, false dice, &c. was not an offence punishable at common law; and it would therefore be an absurdity to punish an agreement to cheat. *Wait's & Bazeley's* cases, 2 *East's C. L.* 571, 573. *Lara's* case, 6 *T. R.* 565. *Wheatley's* case 2 *Burr.* 1127. That if cheating was no offence, surely an agreement to cheat could be no offence. That the authorities relied on by the counsel for the state were most of them cases of conspiracy to do acts which were indictable. That the few cases of a different character were of doubtful authority, and ought not to be held sufficient to establish an absurd principle of law. They also contended, that if our ancestors brought with them the common law of *England,* or any part of it, it was that common law which had been established by judicial precedents at the time of their emigration, and not that which had since been expanded in *England* by judicial decisions. That a conspiracy must be to do some act in itself indictable. 3 *Inst.* 143. 9 *Coke,* 56. 4 *Blk. Com.* 137. *The King vs. Edwards* and others, 1 *Stra.* 707. *The King vs. Turner* and others, 13 *East's Rep.* 238. 4. That admitting a naked agreement to be an indictable offence in this state, still it must be an agreement to cheat some person or being, known to the laws of the state; but that the Bank of the *United States* was a being created by a foreign government, and was wholly unknown to the laws of this state. That an agreement to cheat the Bank of the *United States* could no more be an offence against the laws of this state, than an agreement to cheat the Bank of *England* would be. That if the matters therefore charged in the

indictment be an offence punishable as a crime, the courts of this state have no jurisdiction in this case—the same, if at all, being cognizable in the courts of the *United States.* They referred to the *Const. of U. S. art.* 3, *s.* 1, 2. The act of congress, 1789, *ch.* 20, *s.* 9, 11. *Martin vs. Hunter's Lessee,* 1 *Wheat.* 304, 323, 352. *Robinson vs. Campbell,* 3 *Wheat.* 212, 221. *Houston vs. Moore,* 5 *Wheat.* 1, 22, 24, 68, 72, 74.

BUCHANAN, J. delivered the opinion of the court. This case was brought up by a writ of error directed to the judges of *Harford* county court; and it has been strongly urged, that a writ of error will not lie at the instance of the state, in a criminal prosecution, and therefore that the writ in this case was improvidently sued out, and ought to be quashed. But it is said in 2 *Hale's P. C.* 247, the authority of which it is difficult to question, and, indeed we require none higher, "that if A be indicted of murder, or other felony, and plead *non cul,* and a special verdict found, and the court do erroneously adjudge it to be no felony; yet so long as that judgment stands unreversed by writ of error, if the prisoner be indicted *de novo,* he may plead *auterfoits acquit,* and shall be discharged; but if the judgment be reversed, the party may be indicted *de novo.*" And this is not a loose *dictum,* but it is laid down and repeated as text law; for in page 248 it is stated, that "in the case of the special verdict above, where an erroneous judgment of acquittal is given, yet it is conclusive to the King till it be reversed by error." So in page 394, speaking of the ancient form of a judgment of acquittal, he says "and if the entry were such, I do not think the prisoner could ever be arraigned again, notwithstanding the insufficiency of the indictment, till that judgment of acquittal were reversed." And again in page 395 of the same book, "and if in *Vaux's* case the judgment had been so entered (that is, *quod eat inde quietus,)* he could never again have been indicted for the same offence, notwithstanding the defect of the indictment, till that judgment reversed by writ of error." Hence it is manifest that, in the opinion of Lord *Hale,* the King might have a writ of error in a criminal case; since it would be absurd to say that a man who had obtained a judgment of acquittal for a defect in the indictment, or on a special verdict, could never again be indicted for the same offence,

Dec. 1821.

The State
vs
Buchanan

until that judgment was reversed by writ of error, if a writ of error would not lie. Fortified by such authority alone, in the absence of any legislative provision in this state on the subject, we think we might safely say, without further inquiry, that the writ of error in this case was properly sued out. But instances are not wanting of writs of error being prosecuted by this state, in criminal cases; as in *The State vs. Messersmith & Askew*, *The State vs. Forney*, *The State vs. Brown*, and *The State vs. Durham*, in the court of oyer and terminer &c. for *Baltimore* county. In each of those cases there was a demurrer to the indictment, and judgment on the demurrer for the defendant, in the court below. They were all taken to the late general court on writs of error by the state, *Luther Martin*, attorney general; and in each case the judgment was reversed. And there is no sufficient reason why the state should not be entitled to a writ of error in a criminal case. It is perhaps a right that should be seldom exercised, and never for the purpose of oppression, or without necessity; which can rarely, and it is supposed would never happen, and would not be tolerated by public feeling. But as the state has no interest in the punishment of an offender, except for the purpose of general justice connected with the public welfare, no such abuse is to be apprehended; and as the power of revision is calculated to produce a uniformity of decision, it is right and proper that the writ should lie for the state, in the same proportion as it is essential to the due administration of justice, that the criminal law of the land should be certain and known, as well for the government of courts and information to the people, as for a guide to juries; who though (by the laws and practice of the state) they have a right to judge both of the law and of the fact, in criminal prosecutions, should, and usually do, respect the opinions and advice of judges, on questions of law, and would seldom be found to put themselves in opposition to the decisions of the supreme judicial tribunal of the state.

It has also been contended, that the return of the writ of error in this case, supposing the writ to have been properly sued out, is defective in this, that it is not under the hand and seal of the chief judge, but that there is only a transcript of the record sent up, under the hand of the clerk and the seal of the court, with the writ of error an-

nexed. But there is nothing in the objection. By the

*fifth* section of the act of 1713, *ch.* 4, "for regulating writs
of error, and granting appeals from and to the courts of
common law within this province," it is enacted, "that the
method and rule of the prosecution of appeals and writs of
error, shall for the future be in manner and form as is here-
inafter mentioned and expressed; that is to say, the party
appealing or suing out such writ of error as aforesaid, shall
procure a transcript of the full proceedings of the said
court, from which such appeals shall be made, or against
whose judgment the writ of error shall be brought as afore-
said, under the hand of the clerk of the said court and seal
thereof, and shall cause the same to be transmitted to the
court before whom such appeal or writ of error is or ought
to be heard, tried and determined," &c. The preamble
sets out that "forasmuch as the liberty of appeals and writs
of error, from the judgment of the provincial and county
courts of this province, is found to be of great use and be-
nefit to the good of the people thereof;" and the *second* sec-
tion provides under what circumstances alone, an appeal
or writ of error shall operate as a *supersedeas.* The act
is silent on the subject of the *return* of the writ of error,
and only directs that the transcript of the proceedings shall
be under the hand of the clerk and seal of the court, with-
out dispensing with the signature of the judge to the return
of the writ; yet from that time to the present, the uniform
practice under that act has been, for the clerk to send up
the transcript of the proceedings under his hand only, and
the seal of the court, together with the writ of error, as is
done in this case, unaccompanied by the signature of the
judge to the return of the writ. And if it should be ad-
mitted that it originated in error, it is now too late to shake
a practice so long settled. It may perhaps be doubted
whether that act of the general assembly ought not to be
understood as being applicable to writs of error in civil
causes only; and it has been urged, that no practice grow-
ing out of it in relation to such cases, can be brought in aid
of a defective return in a criminal case. But whatever
may have been the construction originally given to it in that
particular, whether it was held to extend as well to crimi-
nal as to civil cases, or whether the returning of writs of
error in the same manner in criminal as in civil cases, had
its birth in the circumstance, that the mandate of the writ

being the same in each, no good reason could be perceived why the manner of the return should be different; or from whatever other cause it may have arisen, the practice is found on examination to have been the same. That was the form of the return in the cases of *The State vs. Messersmith & Askew,—The State vs. Forney,—The State vs. Brown,—*and *The State vs. Durham;* the cases before alluded to for a different purpose. The same return was made in *Burk's* case, an indictment for a Rape, which was tried before me in *Washington* county court in the year 1809, and was brought up by writ of error to this court, by the present attorney general, *(Luther Martin,)* who defended him with great zeal and ability in the court below, and it is presumed looked well into the subject. And so in every criminal case removed by writ of error, that is to be found among the records of the late general court, of which there are many. The return therefore in this case has the sanction of the same authority on which a similar return in a civil case would rest—the authority of a settled practice for more than an hundred years, with which we are content without seeking to support it on any other; nor is it pretended that such a return would be insufficient in a civil case; and there is no sensible difference between a criminal and a civil case in that respect, or any sound reason why the return should not be the same in one as in the other. But there is no uniform rule for the return of writs of error; and if the object of the writ, which is that a true and perfect transcript of the proceedings shall be brought up, is substantially gratified, it is all that courts do or need look to. If a writ of error be brought in parliament on a judgment in the court of King's Bench, the chief justice goes in person to the House of Lords, with the record itself, and a transcript, which is examined and left there, and then the record is brought back again into the King's Bench. 2 *Tidd's Practice,* 1092. In the court of common pleas the practice is different. There on a writ of error returnable in the King's Bench, it is usual for the chief justice to sign the return. *Ibid, (note.)* But that is not absolutely necessary, for the court of King's Bench will not stay the proceedings for want of his signature; and tho' the writ of error requires the record to be sent *sub sigillo,* yet th's is never practised. *Blackwood vs. The South Sea Company,* 2 *Strange,* 1063. And if the *seal* can be

dispensed with, why may not the signature also? snce the
omission of either, is equally a departure from the man-
date of the writ, and both are dispensed with in the case
of a writ of error returnable from the King's Bench to the
House of Lords. Besides, in *England*, a writ of error
must be directed to him, who has the custody of the re-
cord wherein any judgment is given; and for that reason it
is, that a writ of error brought on a judgment in the court
of common pleas, for instance, is always directed to the
chief justice of that court, who has the custody of the re-
cord. But in this state, tho' the form of the writ as used
in *England*, and introduced here at a very early period, is
still retained, yet the clerk of the court in which the judg-
ment is rendered, has a much greater control over the re-
cord than in *England*, and hence probably *arose* the prac-
tice, that appears to have prevailed here at least from the
year 1713, for the clerk to send up a full transcript of the
proceedings under his hand only, and the seal of the court,
with the writ of error annexed, *which* sufficiently gratifies
the object of the writ; as much so as the practice in the
Court of King's Bench on a writ of error brought in par-
liament; and affords as much certainty of a full and per-
fect transcript of the proceedings, as a return of the writ
under the signature of the chief justice—the course usual-
ly pursued in the Court of Common Pleas, in relation to
writs of error returnable in the King's Bench.

These preliminary questions being thus disposed of, the
next presented for consideration, is whether the facts sta-
ted in the indictment, amount to an offence punishable by
the laws of *Maryland*. This is denied on the part of the
defendants in error, and much reliance is placed on the
statute 33 *Edward I. de conspiratoribus*, on the suppositi-
on that the offence of conspiracy, was originally created
by that statute; or if it was a common law offence, that the
statute either contained a definition of all the conspiracies
that were before indictable at common law, or annulled the
common law, and rendered dispunishable all conspiracies
but such as it defines. And if either position be correct
there is an end to this prosecution, since the matter charged
in the indictment is clearly not embraced by the statute;
and if it was, the statute being considered as not in
force here, the case would not be helped; and there would
be no law in this state, for the punishment of conspiracies

Dec. 1821.

The State
vs
Buchanan

of any description, there being no legislative provision on the subject. But neither branch of the proposition, will on examination be found to be true. The statute is in these words: "Conspirators be they that do confeder or bind themselves by oath, covenant, or other alliance, that every of them shall aid and bear the other falsely and maliciously to indite, or cause to indite, or falsely to move or maintain pleas; and also such as cause children within age to appeal men of felony, whereby they are imprisoned and sore grieved; and such as retain men in the country with liveries or fees to maintain their malicious enterprises; and this extendeth as well to the takers, as to the givers. And stewards and bailiffs of great lords, which by their seignory, office, or power, undertake to bear or maintain quarrels, pleas, or debates, that concern other parties than such as touch the estate of their lords or themselves."

Without looking beyond the statute itself, there may be found sufficient evidence on the face of it, to show that conspiracies were known to the law before. "Conspirators be they," &c. Now why should they have been declared to be conspirators, who should confederate for any of the purposes mentioned in the statute, if they were not liable to punishment for such combinations? And if they were, it was for the conspiracy that they were so liable to be punished, as without the offence of conspiracy, there could have been no punishable conspirators. The statute does not prohibit conspiracies or combinations of any kind, it does not declare combinations or conspiracies of any description to be unlawful, nor does it impose a penalty, or inflict any punishment upon conspirators. And if combinations for any of the purposes mentioned in the statute, were punishable at all, it could only have been on the ground, that both the offence of conspiracy *(eo nomine)*, and the punishment, were known to the law anterior to the enactment of the statute; and that the declaring those to be conspirators, who should be engaged in certain combinations, subjected them to the law of conspiracy as it then existed. And it has never been pretended, that the combinations enumerated in the statute were not indictable conspiracies. The statute, therefore, which had for its object the prevention of the combinations it enumerates, carries with it internal evidence, that conspiracy was an indictable offence before. But the question, whether conspiracies were indictable or not at common law, anterior to the statute 33 *Edward I.*

does not depend alone upon the construction of that statute. In 3 *Coke's Institutes* 143, and 1 *Hawk. P. C.* 193. *ch.* 72, *sec.* 9, it is said, that the *villenous* judgment is given by the common law, and not by any statute, against those convicted of a conspiracy. Now this judgment, called the villenous judgment, which was known only to the common law, could never have been given, unless conspiracy was an offence punishable at common law. In the 20th year of the reign of *Edward* I, a civil remedy. was provided against conspirators, &c. by the writ of conspiracy; and the statute 28 *Edward I, ch.* 10, entitled, "The remedy against conspirators, false informers and embracers of juries," makes this further provision: "In right of conspirators, false informers, and evil procurers of dozens, assises and juries, the king hath provided remedy for the plaintiffs by writ out of the chancery; notwithstanding, he willeth that his justices of the one bench and of the other, and justices assigned to take assises, when they come into the country to do their office, shall upon every plaint made unto them, award inquests thereupon without writ, and shall do right unto the plaintiffs without delay." It must be the provision in the 20th of *Edward I*, for the writ of conspiracy, to which the first clause of this statute has reference, as there does not appear to be any other, and which according to 2 *Institutes* 562, was but in affirmance of the common law; and these provisions for private remedies against conspirators, clearly demonstrate the existence of the offence of conspiracy. It is equally clear, that the statute does not embrace all the ground covered by the common law. Who doubts, or was it ever questioned, that a conspiracy to commit any felony is an indictable offence; as to rob or murder, to commit a rape, burglary or arson, &c. or a misdemeanor, as to cheat by false public tokens, &c? Indeed this has been conceded throughout the whole of the argument in this case, and the ground mainly relied upon, on the part of the defendants in error is, that the object of the conspiracy charged in the indictment, is not of itself an indictable offence. Yet such cases of conspiracy are not made punishable by any statute, and are only indictable at common law; which could not be, if the statute 33 *Edward I*, either furnished a definition of all the conspiracies indictable at common law, or restricted and abridged the latter, by rendering dispunishable, all

Dec. 1821.   such as it does not define.   This statute is not prohibito-
            ry, nor is the existence of other punishable conspiracies,
The State   than those which it enumerates, at all repugnant to, or in-
vs          consistent with any of its provisions; and according to any
Buchanan    known rule of construction, the common law of conspira-
cy such as it was before, may well stand together with the
statute; for surely the merely declaring one act to be an of-
fence, which act as well as others, was so before in con-
templation of law, cannot render those others dispunisha-
ble: nor will one act, which in law amounts to a particular
offence, cease to be so, because another act is merely de-
clared by statute (without any negative words) to amount
to the same offence.   The statute, therefore, must be con-
sidered either as declaratory of the common law only,   so
far as it goes, for the purpose of removing doubts and dif-
ficulties which may have existed in relation to the conspi-
racies it enumerates, by giving to them a particular and
definite description; or as superadding them to other clas-
ses of conspiracy already known to the law, leaving the
common law, in possession of all the ground it occupied
beyond the provisions of the statute.   And so it has been
uniformly understood in *England*, from the earliest down
to the latest decision that is to be found on the subject;
otherwise the judges could not have sustained a great pro-
portion of the prosecutions for conspiracy, with which the
books are crowded; in some of which, the objection, that
the matter charged was not within the statute 33 *Edward*
I, was made and overruled, as will be hereafter shown.
In the *Book of Assises*, 27 *Edward* III, ch. 44, it
is said, that "inquiry shall be made concerning conspira-
tors and confederates, who bind themselves by oath, cove-
nant or other agreement, that each will support the enter-
prizes of the other, whether true or false;" and in the same
book we find this notice of a criminal prosecution: "and
note that two were indicted for a confederacy, each of them,
to maintain the other, whether the matter was true or false;
and notwithstanding, that nothing was alleged to have been
actually done, the parties were put to answer, because it
was a thing forbidden by law."   If this falls within either
of the provisions of the statute 33 *Edward* I, it can only
be that, which relates to the moving and maintaining pleas,
and that does not embrace it; for if the indictment had
been under the statute, for a confederacy "falsely to move

and maintain pleas," which can only have reference to proceedings in courts of justice, it is very clear that the parties must have been acquitted, as the conspiracy was not to do that specific act, otherwise they might have been punished for what they did not contemplate, since nothing being alleged to have been done, *non constat*, that they had any intention to move and maintain pleas within the purview of the statute; and the intention enters into the essence of every offence. The indictment, however, was not under the statute, for either of the specific acts mentioned in it, but at common law for the conspiracy, which was considered *per se* a substantive offence, no act in furtherance of it being alleged, and this after, and notwithstanding the statute. The position, that "a confederacy each to maintain the other, whether the matter be true or false," is a common law offence, is distinctly adopted in 1 *Hawk. P. C.* 190, *ch.* 72, and 9 *Coke's Rep.* (the *Poulterer's* case) 56; and the principle of the case noted in the *Book of Assises*, to wit, that conspiracies are punishable at common law, though nothing be put in execution, is fully recognized in the *Poulterer's* case, in which that book is referred to; and this further principle also laid down, that the law punishes the conspiracy, "to the end to prevent the unlawful act;" and in the same case, speaking of another, article 19, also in the *Book of Assises*, 138, relative to combinations among merchants to regulate the price of wool, it is said, "and in these cases, the conspiracy or confederacy (not the false conspiracy or confederacy) is punishable, although the conspiracy or confederacy be not executed." Hence it is manifest, that the *"nota"* at the end of the case, which seems to be relied on to show, that both malice and falsehood are indispensable ingredients of a punishable conspiracy, and must be united in the same case, was not intended by Lord *Coke* as applicable to all confederacies, but to such false conspiracies only, as are of the character of those, of which he had treated immediately preceding the *nota;* for he does not speak of the case of a conspiracy between merchants to fix the price of wool, as a false conspiracy, nor does either falsehood or malice, necessarily enter into such a combination. And these combinations among merchants, (which are not within the statute 33 *Edward* I.) were, and remained punishable at common law, and were not first

DEC. 1821,
The State
vs
Buchanan

made so by the statute staple, 27 *Edward* III. *ch.* 9, as has been supposed in argument. That statute does indeed prohibit the exportation of wool under a very severe penalty, but neither creates, nor provides a punishment for, the offence by merchants, of combining to fix a price beyond which they would not go. All that is said in relation to the purchasing of that article is, that "all merchants, as well subjects as foreigners, may purchase woolfolk, &c. throughout the whole of our kingdom and territories, without covin or collusion to lower the price of the said merchandizes, so nevertheless as they bring them to the staple;" from which it would seem that all covin and collusion to lower the price of merchandize was before unlawful, and that the statute meant to leave the law as it was. In the *Poulterer's* case, it was clearly considered as an offence at common law; and in 4 *Blk. Com.* 154, the exportation of wool, which, as has been before observed, was prohibited by the statute staple, under a very heavy penalty, is said to have been forbidden at common law, but more particularly by that statute; and if that, which it was the principal object of the statute to prevent and to punish, was before, an offence at common law, it may readily be supposed, that *no* new offence was intended to be created; but that a conspiracy to fix the price of wool, was an offence at common law. Moreover, the words of the statute are "without covin or collusion to lower the price," &c. and a combination to "fix a price, beyond which they would not go," might not necessarily be to "lower" the price. On an information against *Breerton, Townsend* and others, *Noy's Rep.* 103, for the suppression of a will, to the prejudice of *Egerton,* the relator, whose wife was thereby disinherited, all the defendants but one were convicted and fined. This was a case of fraud effected by a confederacy, and the injury was to an individual; the suppression of a will by one was not an indictable offence, though a fraud highly injurious to the party affected by it. It was the confederacy alone which rendered it criminal, and therefore, the information was against the offenders conjointly. In *Timberly and Childe, Siderfin* 68, the indictment was for a conspiracy to charge one with being the father of a bastard child, with intent to extort money from him; and on motion to quash the indictment, it was held by the court to be good. In *Child vs. North and Timber-*

*by*, 1 *Keble* 203, the indictment was for a conspiracy to

deprive the prosecutor of his fame, and to extort money from him, by falsely charging him with being the father of a bastard child. There was a motion to quash the indict- ment, because the conspiracy as laid, was to charge the prosecutor with matter that the court had no cognizance of; which was overruled, on the ground that it *might* be a loss to the prosecutor; and it was held that the conspiracy was punishable, though the court had no cognizance of the matter of it. And in the same case in 1 *Keble* 254, it was moved after verdict in arrest of judgment, that the indictment only charged the parties with a conspiracy to deprive the prosecutor of his fame, and to extort money from him, and not with a conspiracy to charge him before any tribunal having cognizance of the matter of bastardy. But the motion was overruled, and judgment rendered for the king, on the *two* grounds distinctly taken, that it was a conspiracy for lucre and gain, to charge and disgrace a man with having a bastard, and that the *crime* was the conspiracy, which whether it was to defame or disgrace a man, or to charge him with heresy, was punishable at common law. In *The Queen vs. Armstrong, Harrison* and others, 1 *Ventris* 304, the defendants were indicted for conspiring to charge (or burden) one with the keeping of a bastard child, and thereby to bring him to disgrace. After verdict there was a motion in arrest of judgment, on the ground that it did not appear that the party was actually burdened with the keeping of a child; but on the contrary that it was alleged to be only a pretended child; and also, that the party was not stated to have been brought before a justice of the peace on that account; but only that the defendants went and affirmed it to himself, intending to obtain money from him, that it might be no further disclosed; and that a bare unexecuted conspiracy was not a subject of indictment. The objection was over- ruled and the parties were punished by fine. The princi- ple of this case cannot well be misunderstood. It was a conspiracy to extort money from an individual, by going to him, and affirming that he was the father of a bastard child, with a view of inducing him to pay them to say no more about it. And it was decided on the ground (express- ly taken by the court) that it was a contrivance by *conspi- racy*, to defame the person, and *cheat* him of his money,

DEC. 1821. which was an indictable crime of a very heinous nature.
In *The Queen vs. Best* and others, 2 *Ld. Raym.* 1167,
the indictment was for a conspiracy, falsely to charge the
prosecutor with being the father of a bastard child, with
which one *Elizabeth Carter* was pretended to be ensient,
in order to defraud him of his money, and destroy his re-
putation.    On demurrer it was among other things object-
ed to the indictment, that it was not alleged that the
child was likely to become chargeable to the parish, and
that it did not appear, that the prosecutor was by the ac-
cusation put in danger of being subjected to any penalty;
but that it amounted only to a charge, that the defendants
conspired to *tell* the prosecutor that he was the father of the
child the woman was big with,   and that a *bare conspiracy*
to do an *ill* act, was not indictable.    But the demurrer was
overruled, on the principle broadly laid down by the court,
that the defendants being *charged* at least with a *conspira-*
*cy*, to charge the prosecutor with fornication, though that
was only a spiritual defamation, yet the *conspiracy* was the
gist of the *indictment*, and was a temporal offence, and
punishable as such.    The *King vs. Kinnersly & Moore*,
1 *Strange* 193, was a case of conspiracy to extort money
from Lord *Sunderland*, by charging him with an attempt
to commit sodomy with one of the defendants. It was not
charged as a conspiracy to accuse him in a course of justice,
but only *in pais*. The object was to extort money, by
means of a verbal slander, for which the party injured had
his civil remedy, and the mere verbal slander by one only,
would not have been indictable. And in *The King vs.*
*Martham Bryan*, 2 *Strange*, 866, the court in speaking
with reference to *The King vs. Armstrong & Harrison*,
s'y, "there the conspiracy was the crime; and an indict-
ment will lie for that, though it be to do a lawful act." In
this class of conspiracies, the meditated end was not ac-
complished in either of the cases. The object in each
was to defame and extort money from an individual; and
the indirect or wrongful means, by which that object was
intended to be effected, was verbal slander—a combination
to do that, which if actually done by one alone, would not
be the subject of an indictment; for if one verbally defames
another, or extorts money from him, not under colour of
office, it is not an indictable offence. The *conspiracy* there-
fore for a corrupt purpose, was the offence for which they

*The State vs Buchanan*

were punished; and there is no pretence for supposing, as has been urged in argument, that the prosecutions in the bastardy cases were sustained on the ground, that the conspirators contemplated an abuse of judicial authority, by falsely accusing, or causing the parties to be accused, of having bastard children, before justices of the peace having cognizance of such matters. A conspiracy of that character, would there is no doubt have been an indictable offence, having for its object, the subjecting the party accused, to the provisions of the statutes in relation to bastardy. But that is not the nature of the conspiracy charged in either of the cases referred to. In every case the defendants were indicted for a conspiracy to defame and extort money from the prosecutor, by charging him with being the father of a bastard child, not before justices of the peace, but the charge is laid as having been made *in pais;* and in *The King vs. Timberly & North,* one of the objections to the indictment was, that it did not lay the conspiracy to be, to charge the prosecutor before any that had jurisdiction of the matter; and in *The Queen vs. Armstrong, Harrison,* and others, the same objection was raised, and also, that the defendants only went and affirmed it to the prosecutor himself; and so in *The Queen vs. Best,* and others, which with the exception also taken in *The King vs. Timberly & North,* that it was not within the statute 33 *Edward I.* was disregarded by the judges. "Every indictment must contain a certain description of the crime of which the defendant is accused, and a statement of the facts by which it is constituted, so as to identify the accusation, lest the grand jury should find a bill for one offence, and the party be put upon his trial for another, without any authority." 1 *Chitty's Criminal Law,* 169. And "the charge must be sufficiently explicit to explain itself, for no latitude of intention can be allowed, to include any thing more than is expressed."—*Ibid* 172. *The King vs. Wheatly,* 2 *Burr.* 1127. And the accused is put upon his trial only for that, with which he is charged, and against which alone he is called on to defend himself. The prosecutions therefore in the cases referred to, could not have been supported on the ground, that the defendants contemplated an abuse of judicial power, by falsely accusing the prosecutors before justices of the peace; for no matter what they contemplated, that was not what they were charged with, and if they were

only punishable on that ground, as the judges could not by intendment, have supplied what was not expressed, the indictments must have been quashed, or the judgments arrested for want of sufficient matter in law, (which was brought fully under the consideration of the courts,) otherwise it would have been, to punish the defendants for what they were not convicted of, for they could only have been convicted of what was alleged against them in the indictments. And thus the singular picture would have been exhibited in criminal jurisprudence, of men *convicted* of what was no offence in law, and *punished* for what they were neither convicted nor accused of, and for any thing appearing might never have contemplated; but such a stain is not to be found on any page of juridical history. These remarks equally apply to the case of *The King vs. Kinnersly & Moore;* and it is not possible that in either of the cases, the judges went on the ground, that the defendants had accused, or meditated the accusation of the prosecutor before those who had jurisdiction of the matter; on the contrary the idea is expressly negatived by the proceedings themselves. The absence of the allegation was urged in each case, as an objection to the indictment, and the court decided, not that it might be inferred from what was alleged, but that it was not necessary, and that the conspiracy alone to defame and extort money from an individual, without any abuse, or meditated abuse of judicial power, was *per se* an indictable offence at common law. If they had not stated the grounds on which they acted, then indeed any legal principle that could be extracted from the cases, might, in support of the decisions, properly be assumed as the ground on which they were given. But the ground that is here attempted to be assumed, as that on which the conspirators were punishable, is not only different from that, on which the judges expressly place their decisions, but is an illegal ground, and one on which the indictments could not have been supported. Illegal, not because a conspiracy to accuse a man of being the father of a bastard child, or of an attempt to commit sodomy, before those who had cognizance of such matters, was not an indictable offence, but because it was, what was not charged in the indictments, and could not legally be *inferred* from what was expressed. To say therefore, that those conspiracies were indictable, or that the prosecutions were sustained

only on the ground, that the conspirators meditated the

abuse of judicial power, by falsely accusing the prosecutors before a tribunal having cognizance of such offences, would be to overturn altogether the authority of the cases, which has not been attempted; on the contrary their authority seems to be admitted, and their application only to the case under consideration is resisted, on the hypothesis, that they were decided on grounds not appearing in the indictments, and entirely different from those on which the judges professed to act. But the fallacy of the argument becomes obvious, when it is seen, that without a violation of the principle, that "every indictment must contain a certain description of the crime of which the defendant is accused, and a statement of the facts by which it is constituted," the indictments in those cases could not have been sustained upon the grounds on which the decisions are attempted to be placed. Those cases therefore must stand or fall on the grounds upon which they are placed by the judges who decided them, not the *reasoning* of the judges, but the *principles* on which their decisions are made to rest. *The King vs. Parsons*, and others, 1 *Blk. Rep.* 392, was a conspiracy to take away the character of an individual, and accuse him of murder, by means of a mere phantom, which could have no reality—pretended communications with a ghost; and the actual fact of conspiring, was left to the jury to be collected from all the circumstances. The only object of the conspiracy in that case, was to injure the man's reputation. And in *The King vs. Rispal*, 1 *Blk. Rep.* 368, 3 *Burr.* 1320, which was a prosecution for a conspiracy to extort money from an individual, by charging him generally with having taken a quantity of human hair out of a bag; on the objection being raised to the indictment, that the defendants were not charged with having conspired to fix any crime on the party, but only generally with taking the hair, which might be lawful, it was said by Lord *Mansfield*, the other judges concurring, "the crime laid, is an unlawful conspiracy; this, whether it be to charge a man with criminal acts, or such only as may *affect* his reputation, is fully sufficient." That case, if received as authority, settles this principle, that a conspiracy to defraud another by verbal scandal is equally indictable, whether it be to charge the party with a crime, or only to injure his standing in society, and is a full answer to the argument

that the principle of the cases last referred to, is not applicable to this, because they are of conspiracies to fix punishable offences upon the parties. In *The King vs. Shirret*, and others, 1 *Siderfin* 312, the defendants were prosecuted for reading a release to an illiterate man, in other words than those in which it was written, by which he was induced to sign it. It does not appear by the short report of the case, what the form of the indictment was, but as it was against them conjointly, they must have been charged either with conspiracy or combination. The fraud was practised upon an individual, and if it had been perpetrated by one *only*, would not have been an indictable cheat. It was the combination therefore alone which made it criminal, and that too is a case not within the statute 33 *Edward I*. In *The Queen vs. Mackarty and Fordenbourgh*, 2 *Ld. Raym*, 1179, 2 *East's C. L.* 823, the defendants were conjointly indicted, for falsely and deceitfully bargaining and exchanging with another, a quantity of pretended wine, alleging it to be good new *Lisbon* wine, for a certain quantity of hats, which were exchanged and delivered by the party practised upon, on the faith of their false representations, when in fact the pretended *Lisbon* wine, was not *Lisbon* wine. The indictment in this case was not under the statute 33 *Henry VIII. ch.* 1, which prohibits cheating by "means of false privy tokens, and counterfeit letters in other men's names;" nor the statute 30 *Geo. II. ch.* 24, which provides, under heavy penalties, against cheating by "false pretences," (and which was passed long afterwards,) but was for a cheat at common law, and though it did not charge the defendants with a conspiracy *eo nomine*, yet it charged, that they together did the act imputed to them; and as there were no false public tokens, which were necessary at common law, to constitute a cheat effected by *one*, an indictable offence, it was the combination alone on which the prosecution could have been sustained. A cheat perpetrated by the use of false public tokens, such as false weights and measures, is an indictable crime at common law, only because they are means calculated to deceive, and are such, as common care and prudence are not sufficient to guard against; and so as ordinary care and prudence are no safeguard against the machinations of conspirators, cheats effected by conspiracy are punishable at common law, for "*pari ratione, eadem est lex.*"

And in *The King vs. Wheatly*, 2 *Burr.* 1127, cheats effect-
ed by conspiracy, are expressly placed on the same footing
with cheats effected by false weights and measures. In *The
Queen vs. Orbell*, 6 *Mod.* 42, the indictment was for a com-
bination to cheat one J. S. of his money, by getting him to
bet a certain sum on a foot race, and prevailing on the par-
ty to run booty; and the court sustained the indictment on
the ground as they said, that "being a cheat, though it was
private in the particular, yet it was public in its conse-
quence." That was a case emphatically of individual inju-
ry, and as little connected with any public concernment, as
any private transaction could well be, and it was the com-
bination alone on which the prosecution rested; for such a
cheat practised by *one* was clearly not an indictable of-
fence.   In *The King vs. Edwards* and others, 8 *Mod.* 320,
the parties were indicted for giving money to a man, to
marry a poor helpless woman who was an inhabitant of the
parish of B, and incapable of marriage, on purpose to gain
a settlement for her in the parish of A, where the man was
settled.   In that case there was a motion to quash the in-
dictment, on the ground that it was not unlawful to mar-
ry a woman and give her a portion.   But the object of the
conspiracy, being to impose a pauper on a parish to
which she did not belong, it was held by the court to be
an indictable offence at common law; for that a bare con-
spiracy to do a *lawful* act to an *unlawful* end, was a crime,
though no act should be done in consequence thereof.   The
conspirators certainly meditated a fraud on the *inhabitants*
of a particular parish, by burdening them with the support
of a pauper belonging to a different parish, and so far per-
haps it may be viewed as a case of contemplated. private
fraud, as the inhabitants of a *parish* are not the communi-
ty at large.   But whether the principle laid down by the
court, was on the point of meditated individual injury or
violation of public police, does not appear from the report
of the case.   In 3 *Chitty on Criminal Law,* it is treated
as a conspiracy to violate public police; but the principle
equally applies to both.   In *The King vs. Cope* and
others, 1 *Strange*, 144, the prosecution was for a conspi-
racy to ruin the trade of the prosecutor, who was a card-
maker to the king, by bribing his apprentices to put grease
into the paste, by which the cards were spoiled.   The
putting grease into the paste, and thereby spoiling the

DEC. 1821.

The State
vs
Buchanan

cards, if done by *one*, would have been no crime in law, but a private injury, for which the party would have been left to his civil remedy; and it was the conspiracy alone which constituted the offence. And in *The King vs. Eccles*, 1 *Leach's Crown Cases*, 274, the indictment was for a conspiracy, by wrongful and indirect means, to impoverish one *Booth*, a tailor, and to deprive and hinder him from following and exercising his trade. In the first count in the indictment, the object of the conspirators was alleged to have been accomplished, and in the second count the conspiracy only, was charged. It was not denied that the conspiracy was an indictable offence, and the only objection on the part of the defendant was, that the *acts* done to impoverish *Booth*, ought to have been set out in the indictment. But it was decided by the whole court, that it was sufficient to allege the conspiracy and the object of it, the illegal combination being the gist of the offence; and that it was not necessary to state the means, by which the intended mischief was effected; for that the *offence* did not consist in doing the acts by which the end was accomplished, (for they might be perfectly indifferent,) but in the conspiring with a view to effect the intended mischief by any means; and by *Buller*, justice; that "the means were only matters of evidence to prove the charge, and not the crime itself." It has been contended that these last cases were conspiracies to injure public trade; the distinguished judges before whom they were tried have not said so, nor could they have so considered them. They were not so laid in the indictments, but were distinctly cases, in which the meditated injuries were levelled against particular individuals, unconnected with any matter of public concernment, and do not fall within the principles of any of the enumerated offences against public trade, which are offences committed by traders or dealers themselves, such as cheating, forestalling, regrating, &c. So in *The King vs. Leigh* and others, *(Macklin's* case,) 2 *Macklin's Life* 217, in which it was held, that an indictment would lie for a conspiracy to impoverish an actor, by driving or hissing him off the stage: and in *Clifford vs. Brandon*, 2 *Campb.* 358, it was said by Sir *James Mansfield*, that "though the audience had a right to express by applause or hisses their sensations at the moment, yet if a body of men were to go to the theatre,

with a settled intention, of hissing an actor, or even of damning a piece, there could be no doubt that such a *deliberate preconcerted scheme* would amount to a conspiracy, and that the persons concerned in it might be brought to punishment." There the *preconcerted scheme* alone, the *unexecuted conspiracy*, was held to. be indictable; but if put into execution, according to circumstances, it would be a riot. In *The King vs. Robinson and Taylor*, 1 *Leach's Crown Cases*, 37, the defendants were indicted for a conspiracy to raise a specious title in *Mary Robinson* to the estate of *Richard Holland*, by marrying *Taylor*, under the assumed name of *Richard Holland*. The only evidence in the case was of the marriage, and that she lived with *Holland* as a kind of servant. It was distinctly admitted, that a conspiracy to do an injury to the person or estate of another was an indictable offence, and so held by the court, *Willes, Foster* and *Reynolds*, presiding; and it was also ruled, there being no positive proof of an intention to injure *Holland*, that it was not necessary to prove any direct or immediate injury, or even to show any specific overt act of conspiracy, but that it was the province of the jury to collect from all the circumstances of the case, whether there was not an intention or design in the parties to do a future injury to *Holland*. And that case, would seem to cover all the ground necessary to support this prosecution. The conspiracy was levelled at the property or estate of another, and the object was to defraud an individual, but the act by which the fraud was intended to be accomplished, (a marriage under an assumed name) was not in itself unlawful. It has been ingeniously argued here, but not ventured on by those who conducted the defence of *Robinson* and *Taylor*, that they meditated a perversion of the course of justice, as her right to *Holland's* estate could only have been established by judicial proceedings. It was not so charged in the indictment, and without it, the prosecution must have failed, if it had been deemed at all necessary to constitute the offence; for "no latitude of intention can be allowed to include any thing more than is expressed in an indictment," as has been before observed on the authority of Lord *Mansfield*, in the case of *The King vs. Wheatly*, 2 *Burr.* 1127, and 1 *Chitty's Criminal Law*, 172. In *The King vs. Lara*, 6 *T. R.* 565, it was admitted by counsel in argument, that a fraud up-

on an individual by conspiracy was indictable, and the doctrine laid down by the judges in *The King vs. Wheatly*, was fully recognized and adopted by Lord *Kenyon*; that is, that a cheat effected by a conspiracy, was an indictable offence. The case of *The King vs. Berenger*, 3 *Maule & Selwyn*, 68, as it is understood by the court, is a very strong one. The indictment was for a conspiracy by false rumours to raise the price of the public government funds, with intent to injure *such* of the King's subjects as should purchase on a particular day. It was broadly admitted in argument, that if the indictment had stated, "that the defendants conspired to raise the price of the funds in order to cheat or prejudice particular individuals by name, or to benefit themselves at their expense, or that the public were concerned in the purchases of that day, and the defendants conspired, &c. to the prejudice of the public, it would have exhibited a complete offence." But it was contended, that the allegation, that it was with intent to injure "such of the King's subjects as should purchase on that day," was too general, and for that reason only, the indictment was objected to. But the objection was overruled by the court, not on the ground, as supposed in argument, that to constitute an indictable conspiracy, it should be levelled either at the public in its aggregate capacity, or at a *class* or *portion* of the subjects, as distinguished from an individual, and that the case fell within one of those classes of conspiracies; for it was treated throughout as perfectly clear, that if it had been laid with intent to prejudice or defraud either the public, or an individual or individuals by name, it would have been good; and the only difficulty on that part of the case was, whether, being laid with intent to injure *those who* might become purchasers, and not either an individual by name, or the public in its aggregate capacity, the generality of the charge did not vitiate the indictment. But they sustained the indictment *ex necessitate rei*, on the ground, that as it was impossible the defendants could have known who would be the purchasers on that day, the charge could not have been more specific. And though it was conceded, that to raise or lower the price of the public funds, was not *per se* a crime, yet it was held to be an offence for a number of persons to conspire to raise them by false rumours; and that the *crime* was not in raising the funds, but in the act of conspiracy and combination to do so, and would be complete, though

it should not be pursued to its consequences. It was clearly therefore on the point of individual injury that the court went. And so in *The King vs. Gill & Henry, 2 Barnwell & Alderson,* 204, the defendants were indicted and convicted of a conspiracy by divers false pretences, and subtle means and devices, to cheat several individuals by name. The prosecution in that case could not have been sustained, on the ground, as has been supposed, that it was for a conspiracy to commit an offence, indictable of itself under the statute 30 *George II,* against cheating by false pretences; for it is well settled, that in an indictment framed upon that statute, it is not enough to allege generally, that the cheat was effected by divers false pretences, &c. but the particular false pretences must be stated, that the party may know against what he is to defend himself, and that the court may see that there is an indictable offence charged, as there are some pretences which are not within the statute. 2 *T. R.* 586. *East's Crown Law,* 837. So in an indictment at common law for cheating by false public tokens, and so also in an indictment on the statute 33 *Henry VIII,* against cheating by false privy tokens, &c. 3 *Chitty's Criminal Law,* 999. 2 *Strange* 1127. If then the *conspiracy* in that case was only indictable, because it was to commit the statutory offence of cheating by false pretences, as they would form the principal ingredient of the offence, it would have been necessary to set out the particular false pretences by which the cheat was intended to be effected, in order to show that it was the statutory offence which the conspirators intended to commit—on the acknowledged principle, that every indictment must contain a certain description of the crime of which the defendant is accused, and a statement of the facts by which it is constituted. But it was there ruled by the court, that when several persons have once agreed to cheat a particular individual of his money, although they may not at the time have fixed on any particular means for that purpose, the offence of conspiracy is complete, and that it was sufficient to state the conspiracy and the object of it in the indictment, without setting out the means by which it was intended to be accomplished; and per Lord *Mansfield,* in the case of *The King vs. Eccles,* "they may be perfectly indifferent." It is evident therefore that the indictment was not supported on the ground,

that it was a conspiracy to commit an indictable offence; for if it had not been for a *conspiracy* to cheat, but against an *individual*, for the actual commission of the offence, it would have been bad for the generality of the allegation; and the principles of that case embrace every thing that is necessary to the support of the indictment against these defendants. The case of *The King vs. Mawbry and others*, 6 *T. R.* 619, was a conspiracy to pervert the course of justice, which is of itself an indictable offence. That case has no other bearing on the present, than as it shows that all indictable conspiracies are not embraced by the statute 33 *Edward I*, but that at common law a conspiracy to do any thing which the law forbids is indictable. In *The King vs. The Journeymen Tailors of Cambridge*, 8 *Mod.* 10, recognized in *The King vs. Mawbry* and others, 6 *T. R.* 636, the defendants were indicted at common law, and not on the statute of *George*, for a conspiracy to raise their wages; and it was held, that the conspiracy was indictable at common law, though it would have been lawful for either of them to raise his wages if he could. So in *The King vs. Delaval*, 3 *Burr.* 1434, which was a conspiracy to place a girl by her own consent in the hands of *Delaval* for the purpose of prostitution. The act of seduction was not of itself an indictable offence, but it was the *end*, the immoral object of the *conspiracy*, which gave it its criminal character. And the case of *The King vs. Lord Grey*, is of a similar description. In 1 *Hawk. P. C.* 190, *ch.* 72, it is said, "there can be no doubt, that all combinations whatsoever, wrongfully to prejudice a third person, are highly criminal at common law." This is literally adopted and transcribed into 1 *Burn's Justice* 378, and 3 *Wilson's Works* 118. *Chitty* in his 3 *Vol.* on *Criminal Law*, 1139, says, "in a word all confederacies wrongfully to prejudice another, are misdemeanors at common law, whether the intention is to injure his property, his person or his character;" and in 4 *Blk. Com.* 137, (*Christian's* note 4,) "every confederacy to injure individuals, or to do acts which are unlawful, or prejudicial to the community, is a conspiracy." The concurring testimony of these writers, that, all conspiracies wrongfully to injure a third person are indictable offences, is not lightly to be received, though the positions laid down are not assumed as full and definite descriptions of the crime of conspiracy; yet they go quite

far enough for all the purposes of this prosecution. Indeed the four first were only treating of conspiracies levelled against individuals. And such is the character of conspiracy, so ramified is it in its nature, the object and tendency of it being that, from which it derives its criminality, that it would be exceedingly difficult to give a single specific definition of the offence. But by a course of decisions running through a space of more than four hundred years, from the reign of *Edward III*, to the 59 of *George III*, without a single conflicting adjudication, these points are clearly settled:—

1st. That the offence of conspiracy is of common law origin, and not restricted or abridged by the statute 33 *Edward I.*

2d. That a conspiracy to do any act that is criminal *per se*, is an indictable offence at common law; for which it can scarcely be necessary to offer any authority.

3d. That an indictment will lie at common law—1st. For a conspiracy to do an act not illegal, nor punishable if done by an individual, but immoral only—as in *The King vs. Lord Grey* and others, and the case of Sir *Francis Blake Delaval.* 2d. For a conspiracy to do an act neither illegal nor immoral in an individual, but to effect a purpose, which has a tendency to prejudice the public—as in *The King vs. The Journeymen Tailors of Cambridge*, for a conspiracy to raise their wages, either of whom might legally have done so, and *The King vs. Edwards* and others. 3d. For a conspiracy to extort money from another, or to injure his reputation by means not indictable if practised by an individual, as by verbal defamation, and that, whether it be to charge him with an indictable offence or not—as in *Timberly and Childe; Child vs. North & Timberly; The Queen vs. Armstrong, Harrison* and others; *The Queen vs. Best* and others; *The King vs. Kinnersly & Moore; The Queen vs. Martham Brian; The King vs. Parsons* and others, and *The King vs. Rispal.* 4th. For a conspiracy to cheat and defraud a third person, *accomplished* by means of an *act* which would not in law *amount* to an indictable cheat, if effected by an individual—as in *Breerton & Townsend; The King vs Skirrett* and others; *The Queen vs. Macarty & Fordenbourgh; The Queen vs. Orbell; The King vs. Wheatly*, and *The King vs. Lara.* 5th. For a malicious conspiracy, to impoverish or ruin a third person in his

trade or profession—as in *The King vs. Cope* and others;
*The King vs. Eccles; The King vs. Leigh* and others,
*(Macklin's case,)* and the case of *Clifford vs. Brandon.*
6th. For a conspiracy to defraud a third person by means
of an act not *per se* unlawful, and though no person be
thereby injured—as in *The King vs. Robinson & Taylor;
The King vs. Berenger* and others, and *The King vs. Ed-
wards.* and others.     7th. For a bare conspiracy to cheat or
defraud a third person, though the means of effecting it
should not be determined on at the time—as in *The King
vs. Gill & Henry.*     8th. That a conspiracy is a substantive
offence and punishable at common law, though nothing be
done in execution of it—as in the *Book of Assises, ch.* 44;
the *Poulterer's* case; *The King vs. Edwards* and others;
*The King vs. Eccles; The King vs. Berenger* and others,
and *The King vs. Gill & Henry;* and all the authorities
that the conspiracy is the gist of the offence.     And 9th.
That in a prosecution for a conspiracy, it is sufficient to
state in the indictment, the conspiracy and the object of
it; and that the means by which it was intended to be ac-
complished need not'be act out; being only matters of
evidence to prove the charge, and not the crime itself, and
may be perfectly indifferent—as in *The King vs. Eccles,*
and *The King vs. Gill & Henry.*

From all which it results, that every conspiracy to do
an-unlawful act, or to do a lawful act for an illegal,
fraudulent, malicious or corrupt purpose, or for a purpose
which has a tendency to prejudice the public in general;
is at common law an indictable offence; though nothing be
done in execution of it, and no matter by what means the
conspiracy was intended to be effected; which may be
perfectly indifferent, and makes no ingredient of the crime,
and therefore need not be stated in the indictment.     In
1 *Tremaine's P. C.* 82, 83, there is an information against
*Turner* and others, for a conspiracy to destroy the repu-
tation of one *George Green,* and falsely to charge him with
adultery with the wife of one of the conspirators, for the
purpose of extorting money from him.     In 86, against *Re-
cord* and others, for a cheat practised on Lady *Dorothea
Seymour,* in prevailing on her by means of a falsehood to
advance large sums of money to them.     In 91, against
*Wilcox* and others, for cheating by conspiracy one *John
Dutton* of a quantity of cloth, under pretence of buying

them. In 94, against *Taydler* and others, for a cheat by conspiracy, in drawing an absolute conveyance to t! emselves of the estates of two women, and persuading 'hem to execute it, pretending it was only in trust for the women, &c. And in 97, against *Allibone* and others for cheating by conspiracy one *Hilliard*, in obtaining divers bonds from him for the payment of money to themselves and others, as a consideration for procuring a marriage between him and an indigent woman, whom they represented as being rich. In neither of those cases, could an indictment have been sustained for the same injury practised by an individual, without the aid of conspiracy or combination; and as *Tremaine* gives the terms, the reigns, and the names of the respective parties, there can be little doubt, that they are precedents of informations in adjudicated cases, and that they were held to be good; and they go far to show how the common law was understood in *England* in the reigns of *Charles* and *James II.* And the law of conspiracy, as settled by the uniform tenor of the decisions of the courts in *England*, has been recognized and adopted as the common law, by the courts of several of the sister states; as in *The Commonwealth vs. Ward* and others, 1 *Mass. Rep.* 473. *The Commonwealth vs. Judd* and others, 2 *Mass. Rep.* 329; and *The Commonwealth vs. Tibbitts & Tibbitts, ibid* 536; and the cases of *The Journeymen Cordwainers* in *New-York* and *Pennsylvania*; and also in a similar case in this state, by the court of oyer and terminer; &c. for *Baltimore* county, which has it is believed been entirely acquiesced in. In 2 *East's C. L.* title *Cheat*—cheats by conspiracy are treated of, as being on the same footing with cheats effected by the use of false public tokens, as false weights and measures. *Chitty* in his 3 *vol.* title *Conspiracy*, after speaking of indictable conspiracies levelled at individuals, says, "but the object of conspiracy, is not confined to an immediate wrong to particular individuals, it may be to injure public trade, to affect public health, to violate public police, to insult public justice, or to do any act in itself illegal." Thus taking a clear distinction between indictable combinations to *injure* individuals, and such as have for their object an injury to the public at large, or the commission of acts which are in themselves illegal. And in page 1140 he says, "that to constitute a conspira-

Dec. 1821.

The State
vs
Buchanan

cy, it is not necessary that the act intended should be in itself illegal, or even immoral; that it should affect the public at large; or that it should be accomplished by false pretences." Conspiracies are odious in law, and are always taken *mala parte*, and properly. In *The King vs. Rispal*, it was said by Lord *Mansfield* in delivering the opinion of the court, that "they tended to a breach of the peace, as much as cheats or libels." That is the only reason assigned in the books why libels are punishable by indictment; and whether they have in fact a more direct tendency to a breach of the peace, than verbal slanders, which are not *per se* so punishable, it is now too late to inquire—the law is settled, whether the reason be good or bad. There is however a greater malignity of spirit displayed, and a deeper and more lasting mischief contemplated by a deliberately written libel, than by a mere verbal slander, which is often repented of almost as soon as it is uttered. Libels therefore furnish evidence of a disposition, more dangerous to the social order, than verbal slanders, against the effect of which, the law has interposed itself, as a necessary safeguard. So at common law, a cheat effected by false public tokens, as "false weights and measures," is punished *criminaliter*, not because the party cheated is more injured in that way, than by a mere private cheat accomplished by an individual in any other manner, which is not indictable; but because it is *that*, against which ordinary care and prudence are not sufficient to guard, and the *use* of which evinces a disposition to practice upon the whole community. And for the same reason fraudulent, false or malicious conspiracies, to cheat or otherwise injure a third person, are indictable offences; for that ordinary care and prudence, which would be a sufficient guard against the evil designs of an individual, furnish no protection against the machinations of a band of conspirators. *The King vs. Turner* and others, 13 *East's Rep.* 228, has been much relied upon by the counsel for the defendants in error, but the case itself is not at all in hostility with this principle, or with any of the adjudications to which we have had occasion to advert. It was an agreement only, (in the words of Lord *Ellenborough* by whom it was decided) "to go and sport upon another's ground;" not tinctured either with malice, falsehood or fraud. And an agreement

to commit a civil trespass, (for every unauthorised entry upon the possessions of another, though it only be for the purpose of innocent amusement, is in law a trespass) may not, according to circumstances, amount to an indictable offence. But fraud, falsehood and malice, strike at the very root of the social order, as the well being of a community greatly depends on the honesty, truth, and properly regulated passions of those who compose it; and therefore it is necessary that the law should punish them whenever they assume a shape, against the effect of which ordinary care and prudence are not sufficient to guard.

There is nothing in the objection that to punish a conspiracy where the end is not accomplished, would be to punish a mere unexecuted intention. It is not the bare intention that the law punishes, but the *act of conspiring*, which is made a substantive offence, by the nature of the object intended to be effected. And in that respect, conspiracies are analogous to unlawful assemblies. An unlawful assembly, is the assembling of three or more together to do an unlawful act, as to pull down enclosures, and departing without doing it, or making any motion towards it. In that case it is not the bare *unexecuted intention* which the law punishes, but it is the *act of meeting*, connected with the *object* of that meeting, which constitutes the offence; and for that *act of meeting* alone, though it should be to do, what if actually done by one, (as the pulling down of another's enclosures,) would be but a civil trespass, the parties are liable to be punished by fine and imprisonment. And why should the law favour the *act of conspiring* together, falsely to injure the reputation of another, maliciously to ruin him in his occupation, or fraudulently to cheat him of his property, (no matter by what means,) and yet punish the *act of meeting* together to pull down another's fence, without making any motion towards it?

But it is contended, that if our ancestors brought with them the common law of the mother country, or any part of it, it was the common law so far only as it had been established by judicial precedents, at the time of their emigration, and not as it has since been expanded in *England* by judicial decisions. That our ancestors did bring with them the laws of the mother country, so far at least as they

were applicable to their situation, and the condition of an infant colony, cannot be seriously questioned. The rule that "in conquered or ceded countries that have laws of their own, those laws continue in force, until actually altered," &c. is for the benefit and convenience of the conquered, who submit to the government of the conquerors, or in the case of cession, for the benefit of the people, who by *treaty* submit to the government of those to whom their country is ceded, and was not applicable to the condition of our ancestors, as the *Indians* did not submit to their government, but withdrew themselves from the territory they acquired. They were therefore in the predicament of a people discovering and planting an uninhabited country; and as they brought with them all the rights and privileges of native *Englishmen*, they consequently brought with them also, as their birthright, all the laws of *England*, which were necessary to the preservation and protection of those rights and privileges. And it would be difficult to show, that the law of conspiracy was not, at the time of their emigration, quite as necessary to them here in their new and colonial condition as it was in *England*, unless it can also be shown, that there was less necessity here, than there, for the preservation of life, liberty, reputation and property, or protection against falsehood, malice and fraud. If then they did bring with them the common law of conspiracy, which is assumed as undeniable, (though it may have existed potentially only,) they brought it as it is now settled and known in *England*; for what it is now, it was then, if any reliance can be had on ancient authorities; and it is to judicial decisions, that we are to look, not for the common law itself, which is no where to be found, but for the evidences of it. It appears, as has been seen by a note of a case in the *Book of Assizes, 27 Edward III*, that an indictment was sustained at common law for a conspiracy, though nothing was done in execution of it. The same principle is recognized and adopted in 9 *Coke's Rep*, 56, (The *Poulterer's* case,) in its fullest extent; and that is the great principle running through the cases so much objected to in argument, that conspiracies are substantive punishable offences, though they be not executed; and the rest, that it is sufficient to state in the indictment the conspiracy and the object of it, that the means by which it was intended

to be effected, are but matters of evidence to prove the charge, and no part of the crime itself, and may be perfectly indifferent, and need not therefore be set out, are but consequences. And in the case of *Breerton & Townsend, Nay's Rep.* 103, (12 *James I,*) an indictment was held to lie, as has been seen, for a conspiracy to defraud another by means of an act, which if it had been effected by an individual, would not have been indictable. The case in *Nry,* in which the parties were punished by *fine,* also shows, that the villenous judgment was not given in all cases of conspiracy, but that there were at common law, different degrees of punishment, and consequently of crime; and in 1 *Hawk. P. C.* 193, *ch.* 72, *s.* 9, it is said, that it has never been settled to be the proper judgment upon any conviction of conspiracy, except such as threatened the life of the party, which obviates any argument drawn from the villenous judgment, against there being any other conspiracies at common law than those enumerated in the statute 33 *Edward I.* These cases were before the colonization, the charter being in the eighth year of the reign of *Charles I,* and they furnish the leading principles of the doctrine of conspiracy, of which the subsequent decisions are but practical applications, and must be received as expositions of the law as it before existed, and not as creating a new law, or altering the old one, which could only be done by legislative enactment; and cannot be assimilated to occasional alterations, or changes in the practice of courts, in relation to the forms of proceeding, which are only creatures of courts, and often go on mere fiction. And it is a mistake to suppose, that they are *expansions* of the common law, which is a system of principles not capable of expansion, but always existing, and attaching to whatever particular matter or circumstances may arise and come within the one or the other of them; not that this or that combination, is by the common law in terms declared to be an indictable conspiracy, but that it falls within those principles of the common law, which have for their object the preservation of the social order, in the punishing such combinations as are calculated to threaten its well being. Precedents therefore do not constitute the common law, but serve only to illustrate principles. And if there were no other adjudications on the subject to be found, the ju-

dicial decisions since the colonization, furnish conclusive evidence, not only of what is now *understood to be* the law of conspiracy in *England,* so far as those decisions go, but of what were always the principles on which that law rests. And if the political connexion between this and the mother country had never been dissolved, the expression of a doubt would not now be hazarded on the question, whether the same law was in force here. And unlike a positive or statute law, the occasion or necessity for which may long since have passed away, if there has been no necessity before, for instituting a prosecution for conspiracy, no argument can be drawn from the *non user* for resting on *principles* which cannot become obsolete, it has always potentially existed, to be applied as occasion should arise. If there had never been in *Maryland,* since the original settlement of the colony by our ancestors, a prosecution for murder, arson, assault and battery, libel, with many other common law offences, and consequently no judicial adoption of either of those branches of the common law, could it therefore be contended, that there was now no law in the state for the punishment of such offences? The *third section* of the *Bill of Rights,* which declares "that the inhabitants of *Maryland* are entitled to the common law of *England,* and the trial by jury according to the course of that law, and to the benefit of *such* of the *English* statutes, as existed at the time of their first emigration, and which by experience have been found applicable to their local and other circumstances, and of such others as have been since made in *England* or *Great Britain,* and have been introduced, used and practised by the courts of law or equity," has no reference to adjudications in *England* anterior to the colonization, or to judicial adoptions here, of any part of the common law, during the continuance of the colonial government, but to the common law in mass, as it existed here, either potentially, or practically, and as it prevailed in *England* at the time, except such portions of it as are inconsistent with the spirit of that instrument, and the nature of our new political institutions. And surely it cannot be inconsistent with, or repugnant to the spirit and principles of republican institutions, whose strength lies in the virtue and integrity of the citizen, to correct the morals and protect the reputation, rights and property of individuals, by punishing corrupt

combinations, falsely to rob another of his reputation, maliciously to ruin him in his business, or fraudulently to cheat him of his property. If it is, the law of libel, and for punishing cheats effected by false public tokens, should also be rejected; for the one is not more inconsistent with the personal liberty of the citizen than the other, or at all more necessary to the preservation of the social order, and they all rest upon the same principle. And that clause in the *third section* of the *Bill of Rights*, which declares the inhabitants of *Maryland* to be entitled to the benefit of such *British* statutes made since the emigration, as had been introduced, used and practised by the courts of law or equity, and thus virtually inhibits the use of all such as had not been so introduced, furnishes a clear exposition of the whole section, and shows, that it was not the intention of the framers of that instrument to exclude any part of the common law, merely because it had not been introduced and used in the courts here, and strongly implies, that there were portions of that valuable system which had not been actually practised upon. And the judicial proceedings of our courts furnish no evidence of any prosecution before the revolution, for a cheat effected by false public tokens; and yet it is not pretended, that from the *non user*, it is not now an indictable offence.

It is not necessary, as has been contended on the part of the defendants in error, that every one should in fact know what the law is, before he can be punished for what the law forbids. Such a doctrine would be fraught with the most mischievous consequences to society: it is enough that the *offence* was known to the *law* before, and if it be *malum in se*, there is an inward monitor, always present, to warn, advise and instruct. Nor is it any argument against the law of conspiracy, as contended for on the part of the prosecution, that under the *English* decisions, the *act* of conspiring is not required to be proved by positive testimony, but may be inferred by the jury from all the circumstances of the cases. It has nothing to do with the question of what is; or is not an indictable conspiracy; and if it be an objection at all, it is one that arises upon the law of evidence, and is equally applicable to every description of conspiracy. But we cannot perceive what there is in it to quarrel with. It is not confined to the offence of conspiracy—Murder, which reaches

the life of the offender, and various other crimes, may be proved by circumstantial evidence; and there does not seem to be any thing in the crime of conspiracy, that should exempt it from being proved by the same species of evidence. On the contrary, as conspiracies from their very nature, are usually entered into in secret, and are consequently difficult to be reached by positive testimony, it would appear to be peculiarly necessary and proper to permit them to be inferred from circumstances, otherwise the most dangerous and injurious conspiracies would often go unpunished.

I have endeavoured to avoid bringing any thing into this case, which does not strictly belong to it, or assuming any principle that is not well settled. The indictment has two counts, the *first* charges the defendants with an executed conspiracy, falsely, fraudulently and unlawfully, by wrongful and indirect means, to cheat, defraud and impoverish *The President, Directors and Company of the Bank of the United States;* and the *second,* charges them with a conspiracy only, falsely, fraudulently, and unlawfully, by wrongful and indirect means, to cheat, defraud and impoverish *The President, Directors and Company of the Bank of the United* States. *James A. Buchanan,* one of the defendants, was the President of the office of discount and deposit of the mother bank, duly established in *Baltimore; James W. M·Culloh,* another of the defendants, was the Cashier of that office, and *George Williams,* the other defendant, was a Director of the mother bank in the city of *Philadelphia;* and it has been contended, that as an improper use, or embezzlement of the funds of the bank, by either the President or Cashier of the office, would in law be only a breach of trust, a *combination* to effect the same purpose cannot amount to an indictable offence. But however ingeniously urged, there does not appear to be any thing in the argument, when stripped of the dazzling attire in which it was clothed. Seeing, as has been shown, that to constitute an indictable conspiracy, it is not necessary that the act conspired to be done, should, if effected by an individual, be such, as would *per se* amount to an indictable offence. It seems therefore to be perfectly clear, both on principle and authority, that the matter charged in each count in the indictment, constitutes a punishable conspiracy at common law, and that that portion of the common law is in force in this state.

The only question remaining to be examined, that
is, whether under the constitution and laws of the *United*
*States*, the county court of *Harford* had jurisdiction of
the offence in this particular case, (the Bank of the *United*
*States* being chartered by an act of congress,) requires
but little to be said, and will be disposed of in a few words.
A conspiracy to cheat or defraud the bank, is not declared
to be an offence against the *United States* by any act of
congress, and in the case of *The United States vs. Hud-*
*son & Goodwin, 7 Cranch,* 32, it was decided by the su-
preme court, that the courts of the *United States* had no
common law jurisdiction in criminal cases. The authori-
ty of which case is recognized in the case of *The United*
*States vs. Coolidge* and others, 1 *Wheaton,* 415, and until
it shall be overruled by the same tribunal, the principle
must be considered as settled. The matter therefore
charged in the indictment is not an offence against the *United*
*States,* nor cognizable in any of their courts; but a com-
mon law offence against the state of *Maryland*—the act of
congress creating the bank, and the establishment of the
office of discount and deposit in the city of *Baltimore* with-
in the territorial jurisdiction of the state, furnishing only
the occasion for the offence, by bringing into existence the
thing, upon which the fraud is charged to have been com-
mitted. And as the previously vested jurisdiction of the
state, cannot be supposed to be taken away, by the mere
potential right of congress (supposing it to exist) to make
a conspiracy to cheat the bank, an offence against the *Uni-*
*ted States,* and to give exclusive jurisdiction thereof to the
*United States* courts, without any exercise of that right, the
original common law jurisdiction of the courts of the state,
in relation to this subject, remains as it was before the a-
doption of the federal constitution, and will so continue
to remain, until that right shall be exercised by congress
to its exclusion. Whether a concurrent jurisdiction would
be denied to the courts of the state, if congress had in fact
vested jurisdiction of this matter in the courts of the
*United States,* it is not now necessary to inquire, the ex-
clusive jurisdiction being in the courts of the state. It
will be time enough to examine that question when it shall
be regularly presented to us.

It has been urged on the part of the defendants in er-
ror, as an objection to the jurisdiction of the courts of the

Dec. 1821. state, in such a case as this, that the principle would be
dangerous to the well being of the bank, as it might lead
to the passing of laws by the state legislature, calculated
to destroy the institution, under pretence of protecting
its interests. It may be admitted, that the legislature of
the state has no right to pass laws calculated to control or
impede the operations of the bank. But it is difficult to
imagine, how a general power in the judicial tribunals of
the state, to punish an offence against the *State*, can be con-
sidered as an unconstitutional interference with the con-
cerns of the Bank of the *United States*, or as in any man-
ner endangering its security, only because its officers hap-
pen to be the objects of the prosecution, and the offence is
charged to be, to the prejudice of that institution; which for
the purpose of the prosecution is considered as an individual.

*The State*
*vs*
*Buchanan*

CHASE, Ch. J. *(a.)* In this case four questions have been
submitted to the court for their consideration—

1. Whether the state has the right to issue a writ of er-
ror in this case?

2. Whether the record has been legally and properly
transmitted?

3. Whether the court has jurisdiction over this case?

4. Whether the facts charged in the indictment consti-
tute the offence of conspiracy at the common law?

1. As to the first. This is a question which arises on
demurrer to the indictment, and is solely and exclusively
a question for the court to decide on the legal sufficiency
of the indictment.

If the facts charged constitute the crime of conspiracy
at the common law, it is a misdemeanor, and is punishable
by fine and imprisonment. Supposing, for argument sake,
the court below had determined the indictment was suffi-
cient, and the offence a conspiracy at the common law,
there cannot be a question but that the defendants would
have had a right to a writ of error, to have the judgment
of the court below reviewed, and the law settled. Where
the offence is a misdemeanor, it is the right of the party to
have a writ of error *ex debito justitia*—the allowance of the
attorney general in *England* is a matter of course, and
never refused. In this state the allowance of the attorney-
general is not necessary, and never applied for. What
good reason can be assigned why the state should not have

*(a.)* Owing to indisposition the Chief Judge did not attend
when the opinion of the court was delivered in this case.

a writ of error? The right ought to be reciprocal, at least in the case of a misdemeanor. In the Marquis of Win-. chester's case, reported in Sir William Jones and Croke Charles, the right of the king to a writ of error was not questioned. The right of the party accused to bring a writ of error was taken away by the words of the statute of James I, ch. 3; but the right of the king remained—the king not being named in the statute. The offence charged, was recusancy and a misdemeanor, which subjected the party to a fine. This case unequivocally establishes the right of the King to bring a writ of error in the case of a misdemeanor; the court of King's Bench acted on the record returned under it, and pronounced a judgment of reversal. The defect in the judgment in the court below, was the want of the ideo capiatur. The motives which induced the king, or the attorney-general, to issue the writ of error, could not have been a subject of inquiry in the superior court.

Dec. 1821.
The State<br>vs<br>Buchanan

2. As to the question whether the record has been legally and properly transmitted?

I am of opinion that the record has been legally transmitted, and is properly before the court. The act of 1713, ch. 4, provides fully for the transmission of records in all cases civil and criminal, and the mode prescribed by that act has been fully and strictly pursued. The fourth section of that act directs, that the party appealing, or suing out such writ of error, shall procure a transcript of the full proceedings of the said court, &c. under the hand of the clerk of the said court, and the seal thereof, and shall cause the same to be transmitted to the court, &c. upon which transcript the said court shall proceed to give judgment. The transmission of the record in this case has been made pursuant to the fourth section of the act of 1713, ch. 4. and in strict conformity to it, and the previous order of the court below is by no means necessary.

3. As to the third question, whether the courts of Maryland have jurisdiction over this case?

It is the duty of this court to refrain from, and restrain the inferior courts of this state from the exercise of any jurisdiction and power which exclusively belong to the tribunals of the United States. In considering this question, it will be necessary to ascertain the power and jurisdiction of the courts of the United States, and to fix, with preci-

sion, the line of division between them and the state courts,

By the *third* article, and *first* section of the constituti-on of the general government, the judicial power of the *United States* shall be vested in one supreme court, and in such inferior courts as the congress may from time to time ordain and establish. By the *second* section, the judicial power shall extend to all cases in law and equity, arising under the said constitution, the laws of the *United States*, &c. These sections of the *third* article comprehend all the powers vested in the judiciary of the *United States*, so far as respects the question under the consideration of the court.

This is not a question or case arising under the constitution of the *United States*, nor under the laws of the *United States*. The law of the *United States*, establishing the Bank of the *United States*, does not create any offence against the *United States*; and it has been determined by the supreme court, that the common law of *England* is not a part of the laws of the *United States*; and that decision has been since recognized and sanctioned, although some of the judges expressed a willingness to hear an argument on the question.

It is a position, not to be controverted, I think, that all power not granted by the constitution to the general government, is still resident in the states, or the people, and is to be exercised in the manner and way the constitutions and laws of the several states respectively prescribe. If the offence charged had been committed prior to the establishment of the constitution of the general government, and during the existence of the first bank of the *United States*, there cannot be a doubt but what it would have been cognizable by the courts of the state in which the offence was committed, and punishable according to the laws of such state. I therefore am of opinion, that the courts of this state have jurisdiction over the offence charged in the indictment.

4. Having disposed of the preliminary questions, and all impediments being removed which were supposed to prevent the consideration of the fourth and last question, I shall now endeavour to express my opinion upon it, and shall do it in as concise and plain a manner as possible, consistent with perspicuity.

The question is important as it concerns the state, and

the individuals accused, and has undergone a very full and elaborate discussion, and nothing has been omitted which splendid talents could urge, or ingenuity invent, to elucidate the subject, and place the question in every view of which it is susceptible; but as it appears to me, it lies within a small compass.

The indictment, after stating the establishment of the Bank of the *United States* by an act of congress, and the relative situation of the accused to the bank and the stockholders thereof, charges "that," &c. [*Here the Chief Judge stated the indictment as herein before set forth.*]

To this indictment there is a general demurrer, by which the facts set forth in the indictment are confessed and admitted by the accused to be true, for the purpose of submitting the question to the decision of the court, whether the facts charged constitute any offence indictable and punishable according to the common law of *England?*

In order to determine this question, it becomes necessary to consider what is the common law of *England* as respects this case, and whether the common law of *England* is the law of this state?

The common law of *England* is derived from immemorial usage and custom, originating from acts of parliament not recorded, or which are lost, or have been destroyed. It is a system of jurisprudence founded on the immutable principles of justice, and denominated by the great luminary of the law of *England*, the perfection of reason. The evidence of it are treatises of the sages of the law, the judicial records and adjudications of the courts of justice of *England*.

The people of *Maryland* have not only recognized the common law of *England* as the law of the state, but by the declaration of rights made by them in convention in 1776, claimed and asserted a right to the common law of *England* as it was then understood in *Maryland*, and had been transmitted to us by the reports of adjudged cases, decided by the courts of *England*, and understood by learned men of the profession, who had written on that subject. The common law of *England* was adopted by the people of *Maryland*, as it was understood at the time of the declaration of rights, without restraint or modification. Whether particular parts of the common law are applicable to our local circumstances and situation, and our

general code of laws and jurisprudence, is a question that comes within the province of the courts of justice, and is to be decided by them. The common law, like our acts of assembly, are subject to the control and modification of the legislature, and may be abrogated or changed as the general assembly may think most conducive to the general welfare; so that no great inconvenience, if any, can result from the power being deposited with the judiciary to decide what the common law is, and its applicability to the circumstances of the state, and what part has become obsolete from *non user* or other cause.

I think it may be assumed as a position which cannot be controverted, and is free from doubt, that the common law of *England*, as it was understood at the time of the declaration of rights, was the law of *Maryland;* and I think the position is equally clear, that it must be ascertained by the writings of learned men of the profession, by the judicial records and adjudged cases of the courts of *England.*

The questions now occur, Do the facts contained in the indictment constitute the crime or offence of conspiracy? And is conspiracy an offence at common law, indictable and punishable as such?

Sergeant *Hawkins*, in his Pleas of the Crown, *ch.* 72, in defining conspiracy at common law, makes use of strong and explicit language, and says there can be *no doubt* but that all confederacies whatsoever, *wrongfully to prejudice* a third person, are highly *criminal at common law*; as where divers persons confederate together by indirect means to impoverish a third person. This definition is corroborated and supported by adjudged cases in the courts in *England*, and especially in the courts of King's Bench.

In 1 *Lev.* 125, 1 *Burn's Justice*, 355, *The King vs. Sterling* and others, Brewers of *London*—Information for unlawfully conspiring to impoverish the excisemen by making orders that no small beer, called gallon beer, should be made for a certain time, &c. The whole court concurred in the opinion, and gave judgment for the King.

The statute 33 *Edw. I*, *de conspiratoribus*, was made in affirmance of the common law, and is a final definition of the instances or cases of conspiracy mentioned in it; but certainly it does not comprehend all the cases of conspiracy at the common law, which is most apparent from the adjudged cases of the courts of *England* on that subject.

I consider the adjudications of the courts of *England*, prior to the era of the independence of *America*, as authority to show what the common law of *England* was in the opinion of the judges of the tribunals of that country, and since that time, to be respected as the opinions of enlightened judges of the jurisprudence of *England*.

The better opinion appears to be, that a conspiracy to do an unlawful act is an indictable offence, although the object of the conspiracy is not executed. In this case the conspiracy to cheat, defraud and impoverish, the Bank of the *United States*, by appropriating the monies, promissory notes, and funds of the bank, to the use of the accused, has been proved by the admission and confession of the defendants, and a consummation of all the overt acts has been fully established.

The *Poulterer's* case, 9 *Coke*, 56, 57—The *falsa alligantia* is a false binding, each to the other, by bond or promise to execute *some unlawful act*. Before the unlawful act executed, the law punishes the coadjunction, confederacy or false alliance, to the end to prevent the unlawful act—*quia quando aliquid prohibetur, prohibetur et id per quod pervenitur ad illud. Et effectus punitur licet non sequatur effectus;* and in these cases the common law is a law of mercy, for it prevents the malignant from doing mischief, and the innocent from suffering it. The defendants were punished by *fine* and *imprisonment*.

I think it is established by the decisions of the courts of *England*, that a conspiracy to cheat is an offence indictable and punishable at common law—*Rex vs. Wheatly*, 2 *Burr.* 1125. A cheat or imposition by one person only is not indictable at common law, but a conspiracy to cheat by two or more is indictable at common law, because ordinary care and caution is no guard against it. Indictment against *Macarty* and others, for a combination to cheat in imposing on the prosecutor stale beer mixed with vinegar, for port wine—6 *Mod.* 301. Indictment against *Cope* and others, for a conspiracy to ruin the trade of the prosecutor by bribing his apprentices to put grease into the paste which had spoiled his cards—1 *Strange* 144. Indictment against *Kinnersley* and *Moore*, for a conspiracy to charge Lord *Sunderland* with endeavouring to commit sodomy with said *Moore*, in order to *extort money* from Lord *Sunderland*. The whole court gave judgment

in support of the indictment, and punished *Kinnersley* by fine, imprisonment, &c. and sentenced *Moore* to stand in the pillory, suffer a year's imprisonment, and to give security for his good behaviour—1 *Stra.* 193, 196. Indictment against *Rispal*, 3 *Burr.* 1320—The indictment sets forth, that *Rispal*, and two others, did wickedly and unlawfully conspire among themselves, falsely to accuse *John Chilton* with having taken a quantity of human hair out of a bag, &c. for the purpose of exacting and extorting money from the said *John Chilton*. The court were of opinion, that the indictment was well laid, and that the gist of the offence is the *unlawful* conspiring to injure *Chilton* by this false charge.

A combination among labourers or mechanics to raise their wages, is a conspiracy at common law, and indictable (8 *Mod.* 10,) although lawful for *each separately* to raise his wages.

I consider the doctrine so firmly established by the decisions of the courts of *England*, prior to the era of our independence, that a combination or confederacy to do an unlawful act, is a conspiracy indictable and punishable at common law, that I have deemed it unnecessary to refer to all the cases relative to this question, and therefore have contented myself with citing some of those which appear to me most apposite.

The opinion of Lord *Ellenborough* in *The King vs. Turner and others*, 13 *East*, 230, does not impugn, but strongly sanctions and confirms this doctrine. He says the cases of conspiracy have gone far enough, he should be sorry to push them still further. The charge in the indictment was for committing a civil trespass. He also says, all the cases in conspiracy proceed on the ground that the object of the conspiracy is to be effected by *some falsity*.

I am of opinion that the judgment be reversed, and the demurrer overruled.

JUDGMENT REVERSED.

The counsel on the part of the state moved the court for a writ of *procedendo* to *Harford* county court, directing that court to proceed to a new trial of the prosecution. This was resisted by the counsel of the defendants in error; but THE COURT awarded a writ of *procedendo*.